IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


JANE DOE 1, JANE DOE 2, and JANE DOE 3,


        Plaintiffs,


v.                                  No:

                                               **PLAINTIFFS DEMAND JURY TRIAL**


GREGG GARNER, an individual,

GLOBAL OUTREACH DEVELOPMENTS
INTERNATIONAL (G.O.D), a nonprofit corporation,

INSTITUTE FOR G.O.D. INTERNATIONAL,
a nonprofit corporation,

THE CHURCH COMMUNITY FOR G.O.D.,
a nonprofit corporation, and

DOES 5-20, inclusive,

        Defendants.

    _____/


1

# **COMPLAINT**

Between 2022 to 2025, Gregg Garner, the charismatic leader of G.O.D. International, sexually abused and assaulted multiple women who were members of G.O.D., coercing his victims to participate in numerous sex acts, including sexual intercourse. Garner also coerced his victims through the threat of serious harm into providing unpaid labor and services. Garner exploited his position of trust as the spiritual leader of G.O.D., using the tools of cult indoctrination, such as food and sleep deprivation, social isolation, and extreme emotional abuse, to further his psychological control of his victims. Garner controlled every aspect of his victims' lives, including their schooling, their employment, their spouse's employment, their housing, even the schooling of their children, and used this control to reward compliance with his abusive scheme and to ensure his victims' silence. While Garner preached a message of sexual purity, his victims endured his acts of sexual prurience for years, terrified that any resistance would tear apart their lives.

Plaintiffs Jane Does 1-3 now bring this action against Defendants for conspiring to operate, and for operating, a sex and labor trafficking venture ("Venture") under the umbrella of religious and educational organizations centered around Garner. Defendants conspired to participate in, and participated in, the Venture to commit sex trafficking, peonage, forced labor, and human trafficking offenses in violation of Chapter 77 of Title 18. The central purpose of the conspiracy and Venture was to entice Plaintiffs to join Garner's religious community and businesses, which functioned as both a high-control coercive group and a system of economic exploitation. Defendants exerted comprehensive power over Plaintiffs, took their money, made it financially and psychologically difficult, and in some cases impossible, to leave the coercive sexual and psychological abuse of Garner, and systematically abused Plaintiffs physically, sexually, emotionally, and economically.

In doing so, Defendants achieved numerous benefits including enriching Defendant Garner and entity Defendants, wielding power over others, advancing Garner's status as religious leader

2

and business owner, and providing Garner with sexual access to multiple women simultaneously. Defendant Garner also benefited financially through receipt of profits from multiple business entities and substantial access to free labor, including massage therapists, personal assistants, and other professional services totaling thousands of hours valued at over $800,000.

In pursuit of both the conspiracy and the Venture, Defendants engaged in a variety of wrongdoing, some tortious and some criminal. Defendant Garner played the critical role in the conspiracy as founder, leader, and sole beneficiary of systematic exploitation. Neither the conspiracy nor the Venture could have functioned without his comprehensive control over every aspect of Plaintiffs' lives: employment, income, housing, children's education, spiritual community, healthcare, and personal relationships. It was foreseeable that each Plaintiff would be harmed by this conduct, and all conspirators are liable for the entire amount of physical, emotional, psychological, and economic harm caused to Plaintiffs.

## JURISDICTION AND VENUE

1.       Plaintiffs bring this Trafficking Victims Protection Act and Forced Labor case pursuant to 18 U.S.C. §§ 1589, 1591(a)(1), (2), 1591(d), 1594, and 1595; the Tennessee Human Rights Act; and the common law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent hiring, retention, and supervision.

2.       This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367(a).

3.       Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Davidson County, in the Nashville Division of the Middle District of Tennessee.

## PARTIES

4.       Plaintiff, Jane Doe 1, a female, was a citizen and resident of Old Hickory, Davidson County, Tennessee, during the operative time.

3

5.     Plaintiff, Jane Doe 2, a female, was a citizen and resident of Old Hickory, Davidson County, Tennessee, during the operative time.

6.     Plaintiff, Jane Doe 3, a female, was a citizen and resident of Old Hickory, Davidson County, Tennessee, during the operative time.

7.     Defendant Gregg Garner is an individual residing in Old Hickory, Davidson County, Tennessee and was the Chief Executive Officer of Global Outreach Developments International during the operative time.

8.     Defendant Global Outreach Developments International (G.O.D.) is a Tennessee non-profit corporation licensed to transact business in Tennessee. Its principal office address is 401 Center St., Old Hickory, TN 37138-2417. Its registered agent for service of process is Genovations Accounting, LLC, located at the same address.

9.     Defendant Institute for G.O.D. International is a Tennessee non-profit corporation licensed to transact business in Tennessee. Its principal office address is 401 Center St., Old Hickory, TN 37138-2417. Its registered agent for service of process is Genovations Accounting, LLC, located at the same address.

10.    Defendant The Church Community for G.O.D. is a Tennessee non-profit corporation licensed to transact business in Tennessee. Its principal office address is 401 Center St., Old Hickory, TN 37138-2417. Its registered agent for service of process is Genovations Accounting, LLC, located at the same address.

11.    Defendant Individuals Does 5 through 9 are church members and leaders who participated in the sex trafficking conspiracy and/or enabled clergy abuse. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

4

12.     Defendant Entities Does 10 through 20 are nonprofit and for-profit corporations used by Defendants in furtherance of the sex trafficking conspiracy. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

13.     Plaintiffs are informed and believe and thereon allege that each of the Defendants is responsible individually and as an agent, contributor, and co-conspirator in a single enterprise with and as the alter ego of all other Defendants.

14.     At all relevant times, the unlawful conduct against Plaintiffs as described herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, on information and belief, the unlawful conduct described herein was committed under actual or apparent authority granted by Defendants such that all of the unlawful conduct of all Defendants is legally attributable to all other Defendants.

15.     At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described herein, unless otherwise indicated, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

**FACTUAL BACKGROUND**

16.     Plaintiffs' claims arise out of their involvement with a network of religious and business organizations based in Nashville, Tennessee and founded, operated, and controlled by Defendant Garner.

17.     Defendant Garner presented himself to the community as a pastor, Bible teacher, marriage counselor, business mentor, and humanitarian leader dedicated to serving the poor and marginalized while living a modest lifestyle. In reality, Garner operated a sophisticated trafficking and forced labor venture designed to exploit young women for unpaid labor, extract money from followers, and to maintain a group of women whom he could sexually victimize through grooming, enticement, and coercion.

5

18.     Garner's principal operations included religious organizations (Church for G.O.D., Institute for G.O.D.), educational institutions (Academy for G.O.D.), and multiple non-profit and for-profit entities including Soma Wellness LLC (massage therapy), Hopewell Family Care LLC (medical practice), The Arts at Center Street (arts education), MCH Nashville LLC (construction/homebuilders), and others—creating as many as twelve domestic business entities plus operations in Africa and El Salvador.

## A.     Garner Used His Position as Founder, Lead Pastor, and CEO of G.O.D. to Perpetrate a Sex Trafficking and Forced Labor Scheme

19.     Beginning in at least 2022 and continuing to at least 2025, Garner used his position as founder, lead pastor, and Chief Executive Officer (CEO) of G.O.D., the Institute for G.O.D., and the Church Community for G.O.D. (collectively, "the G.O.D. Entities") to use force and coercion to sexually abuse and assault Jane Doe 1, Jane Doe 2, and Jane Doe 3, in violation of 18 U.S.C. § 1591.

20.     Garner also used serious harm and threats of serious harm, including psychological, reputational, and financial harm to Jane Does 1-3 and their family members, to coerce Plaintiffs to provide compelled and unpaid labor and services, in violation of 18 U.S.C. § 1589. Garner induced students and community members to work for his businesses at below-market wages or without compensation, extracting thousands of hours of unpaid professional services. For example, for Jane Doe 3, it is estimated that she performed professional services valued at over $800,000 for which she was not properly compensated..

21.     At all relevant times, Garner was the CEO, lead pastor and spiritual leader of the G.O.D. entities, located in the Lakewood community which he founded in 2003 in the greater Nashville area.

6

22.     Garner used his position as spiritual leader to indoctrinate young members/recruits into the G.O.D. Entities, exerting near total control over their education, finances, employment, romantic and personal lives, to the point where Garner psychologically controlled his victims. Garner also groomed his victims for years, eroding their physical and emotional barriers, normalizing sexual speech and conduct, and ultimately enticing Jane Does 1-3 to participate in nonconsensual and coerced sex acts.

23.     Garner used three primary means and methods to recruit, entice, harbor, provide, obtain, maintain, and solicit Plaintiffs, including but not limited to: (1) providing schooling, employment and housing to Plaintiffs and, in the cases of Jane Does 2 and 3, to their husbands and schooling to their children; (2) grooming and enticing Plaintiffs over the course of years, through normalizing sexual comments and touch, and eroding any physical and sexual barriers; and (3) using his position as lead pastor and spiritual leader to effectively brainwash Plaintiffs, creating an environment where they placed complete trust in him, thereby allowing him to entice Plaintiffs to participate in sexual activities they would otherwise refuse, and manipulating them to remain under his control within the G.O.D. community.

   **a.  Grooming Methodology**

24.     Garner employed systematic grooming tactics refined over decades, targeting young women when they were teenagers or young adults in positions of vulnerability and trust.

25.     **Phase 1 - Establishment of Authority** (Ages 15-21): Garner met victims as their teacher, pastor, or spiritual mentor, establishing himself as authority figure worthy of complete trust and obedience. He singled them out as "special," provided individual attention, and positioned himself in multiple overlapping roles (teacher + pastor + counselor + future employer). During this time, Garner would also take victims on "mission trips" where physical and emotional boundaries were eroded. Further, to the extent any victim dated a person who was not a member

7

of the church, he would interfere and threaten their relationship, threatening ex-communication from the church.

26. **Phase 2 - Isolation and Control** (Young Adulthood): Garner enrolled victims in his Bible college (the Institute), limited their contact with the outside world, hired victims into his businesses, married or counseled their marriages, employed their spouses, enrolled their children in his schools, controlled their housing through his construction company and the G.O.D. Entities' land acquisition, and became their complete social world. Departure became impossible without catastrophic loss.

27. **Phase 3 - Physical Boundary Erosion** (Years of Employment): Garner gradually eroded physical boundaries through: shoulder rubs and neck massages; forced napping together on office couches; groping "in his sleep"; sharing hotel rooms abroad; cornering victims and engaging in forced/noncompliant kissing; public requests to "check his pants" because his penis was "so big, it was hard to hide."

28. **Phase 4 - Sexual Exploitation** (2022-2025): After years of grooming and control, Garner escalated to sexual assault through: requesting nude photos via the Signal application, an encrypted form of text communication; exposing his genitals during massage sessions; groping during social gatherings; kissing on the lips; on at least one occasion, drugging with a THC vape pen; forced oral sex; rape without condoms; and maintaining simultaneous sexual relationships with all three Plaintiffs and other known and suspected victims, without their knowledge of each other.

29. **Phase 5 - Maintenance Through Coercion**: Garner maintained control through: threats that disclosure would destroy the ministry and be the victims' fault; commands to "take it to the grave"; turning off victims' phone location tracking and ordering them to lie to husbands;

8

creating financial dependency through underpayment; using spiritual authority to justify continued sexual relationships; and retaliation against employees who set boundaries.

**b.  Coercion through Psychological, Reputational, and Financial Control**

30.     Garner used psychological, reputational, and financial control to coerce Plaintiffs, and the threat that the victims could lose their community, jobs, and housing by crossing him or revealing the abuse he was perpetrating, namely, coerced sex acts and compelled labor and services. Absent such coercion, Plaintiffs would never have willingly participated in sex acts with Garner, nor would they have provided compelled and uncompensated labor and services to Defendants.

**i.  Psychological Control**

31.     Garner recruited young adults into G.O.D. with Jane Does 1-3 recruited between the ages of 15-22. During Phase 1 of Garner's grooming and recruitment, Plaintiffs traveled with him on missions' trips abroad. Garner led these trips and used traditional cult-like methods to indoctrinate Plaintiffs. Plaintiffs were often deprived of food, sleep, information, any sense of time/schedule, and contact with the outside world. During these trips, Garner would alternate between verbal abuse, berating the recruits in front of each other, and lavishing them with attention and praise. These wild swings of behavior left Jane Does 1-3 in a state of constant apprehension as to whether they would receive approval from Garner or incur his abuse for some unanticipated failure. This became a powerful form of psychological control. The recruits were conditioned to always seek Garner's favor. Any kind/positive word was felt powerfully by a recruit and became a form of status in the group.

32.     After their missions' trips, and at Garner's direction, Plaintiffs each enrolled in the Institute for G.O.D., the Bible-based college which Garner also founded and ran. Garner's psychological control over the recruits became total in this setting: he controlled and monitored

students' contacts with the outside world, including forbidding dating outside the Institute, and managed every aspect of their daily lives. At least one Plaintiff became estranged from her family who questioned Garner's methods and worried that he was using cult-like methods to control and isolate his recruits.

33.     Garner continued to control all aspects of Plaintiffs' lives after their graduation from the Institute for G.O.D. Garner assigned Jane Does 1-3 to jobs within the G.O.D. Entities, including for-profit entities owned in whole or majority part by Garner, stating that it was part of God's plan for them to perform this work, even if they had no prior experience or training to perform such labor. In some instances, Garner would verbally abuse Plaintiffs, to create a constant fear and apprehension about their job performance, and then demand Plaintiffs perform additional labor without pay.

34.     Throughout, Garner maintained comprehensive psychological and financial control over Plaintiffs' lives by simultaneously occupying multiple positions of authority over each victim, and in many instances, their spouses' employment: pastor, employer, marriage counselor, business partner, financial advisor, and children's educator. This consolidation of power created an inescapable web of control where setting boundaries or leaving would result in loss of employment, housing, children's education, spiritual community, and social connections—making departure financially and psychologically impossible.

### ii.  Reputational Control

35.     If anyone crossed Garner or left the G.O.D. community, he insisted on complete ostracization of the former member. Garner told recruits/members not to talk with, nor associate with, the departed member again. Because Plaintiffs' entire lives revolved entirely around the G.O.D. community, with their employment, housing, finances, and extended family tied to Garner-run entities, the possibility of ostracization terrified them and served as a powerful form of control.

10

### iii. Financial Control

36.      Jane Does 1-3 worked for Garner, received housing through him, and in the case of Jane Doe 2 and Jane Doe 3, their husbands were also employed by a Garner entity. The children of Jane Does 2 and 3 also attended the Academy for G.O.D. Any attempt by Plaintiffs to leave the G.O.D. community would have been financially impossible given the extensive level of control Garner held.

37.      The housing was all in the same "neighborhood." Garner decided who lived where and the houses once acquired by someone in the G.O.D. community were typically sold to other community members. This neighborhood was located within walking distance to the Academy where all of the members' children attended.

### c. <u>Benefits to Victims</u>

38.      Immediately upon engaging in coerced sex acts, a victim's position with Garner would improve, *i.e.*, Garner's abusive comments would stop, and Garner would offer things like access to a company credit card, improved employment conditions, and additional income. These benefits were offered in the context of the coerced sex act, often in the same room before or immediately after the sex act, or in the context of a victim threatening to take some kind of action to reveal the assaults. These benefits also served a coercive end, as Garner could continue to use the victims' extreme financial dependence as a means of control.

39.      In effect, Garner's sex acts were part of a quid-pro-quo employment arrangement with Plaintiffs where sexual compliance was exchanged for continued employment and avoidance of retaliation. Plaintiffs lacked the means to end Garner's sex acts because the financial costs, *i.e.*, loss of employment was too great. In exchange for their continued participation in Garner's coerced sex acts, Plaintiffs not only maintained their jobs, but received slightly more tolerable and less abusive working conditions.

## B.     Jane Doe 1's Factual Allegations

40.     Jane Doe 1 was approximately 21-22 years old when she was recruited by Garner into the G.O.D. Entities. Her initiation began on a "mission's trip" abroad, led by Garner, where she witnessed Garner's repeated abusive and controlling behavior with other recruits, a process in which public shaming served to psychologically condition recruits to seek his approval.

41.     Jane Doe 1 was frequently denied food, sleep, and any connection to the outside world during the trip. Garner led her and the other recruits on lengthy train and bus travel within the foreign country without providing any schedule or itinerary, intentionally creating a disorienting environment that fostered complete dependence on Garner. Garner manipulated recruits by telling them to turn their control over the God, when in reality, Garner controlled every facet of their lives.

42.     Shortly after the mission trip, Jane Doe 1 moved to Nashville permanently and enrolled in the Institute. This triggered the concern of her parents, who expressed their worries to Jane Doe 1 that Garner appeared to be running a cult. Jane Doe 1 temporarily became estranged from her parents, becoming further isolated and vulnerable to Garner's control and manipulation.

43.     In addition to attending the Institute, at the behest of Garner, Jane Doe 1 began volunteering with a non-profit which was also under Garner's control.

44.     In May 2015, Jane Doe 1 was hired by G.O.D. International. In or around October 2015, Garner assigned Jane Doe 1 to be his assistant at G.O.D. International. Garner described the position as "24/7 on call," and asked that she make a minimum commitment of six years. Jane Doe 1 felt pressured to agree with Garner that God had specifically "called" her to this position, when she did not feel this way and had no prior experience in such a role.

45.     Immediately upon hiring her, Garner took comprehensive control of Jane Doe 1's life:

    a.  Phone Control: Garner set his calls and texts to always pass through Jane Doe 1's "do not disturb" mode, made his contact the priority, demanded "read receipts" be turned on.

    b.  Thumbprint Access: Garner put his thumbprint into her phone for full access to her device, communications, and data.

    c.  Immediate Responsiveness: If Jane Doe 1 did not respond to texts within minutes, Garner would call; if no answer, he would call again repeatedly until she responded.

46.     Shortly after hiring Jane Doe 1 in 2015, Garner scheduled an international trip where G.O.D. did missions work. Garner arranged for Jane Doe 1 to leave two days early with him and to stay in the same hotel room with him alone. No one in the organization questioned this arrangement. Garner later used this as evidence of how much he had "invested" in their relationship.

### a.  Psychological Abuse and Workplace Trauma (2015-2018)

47.     The early years of Jane Doe 1's employment were tumultuous and verbally abusive. Garner repeatedly berated Jane Doe 1 and told her she was not a good assistant.

48.     Meetings between Jane Doe 1 and Garner would end with Jane Doe 1 crying, apologizing, and promising to do better. Isolated under his abuse, Jane Doe 1 began to second-guess herself constantly, living in a state of bewilderment and agony that left her feeling mentally unstable.

13

49.     Jane Doe 1 made several attempts to request a new position, but Garner always declined and insisted she remain his executive assistant, even as his verbal abuse and humiliation of her continued unabated.

50.     Garner further isolated Jane Doe 1 by speaking negatively about her to others in the organization, creating social isolation within her workplace.

51.     By 2018, Jane Doe 1 had been conditioned through years of verbal abuse to subjugate her own emotions, needs, and autonomy to Garner's demands.

**b.  Physical Boundary Violations (2018-2019)**

52.     In 2018, Garner received a thyroid cancer diagnosis. Using this as pretext, Garner began asking Jane Doe 1 to take naps with him on his office couch, claiming exhaustion from alternative cancer treatments. Garner continued to initiate naps with Jane Doe 1 for at least a year (2018-2019).

53.     During the "naps," Jane Doe 1 would lie silently on the couch while Garner lay next to her and groped her. When people knocked on Garner's door during the "naps," Jane Doe 1 would remain silent, not revealing their presence together.

54.     Garner's extreme verbal abuse of Jane Doe 1 in the workplace gradually lessened as the "naps" continued. While Jane Doe 1 felt some relief that the verbal abuse had decreased, she also felt deep confusion and disassociation over what Garner was doing to her body and why.

55.     Jane Doe 1 knew Garner's behavior was inappropriate, but told no one because Garner was her boss, pastor, and the person who controlled her livelihood.

56.     During one trip abroad, Garner initiated a nap with Jane Doe 1 on his hotel bed. When another man tried to enter the room, Garner instructed Jane Doe 1 to be quiet and then directed her to escape via the balcony to return to her own room.

**c.  Surveillance and Privacy Invasion (2019-2025)**

14

57. In 2019, the Tennessee Bureau of Investigation (TBI) conducted a raid on the G.O.D. campus as part of an investigation into Garner. After the raid, Garner convinced the organization that their phones were tapped and rooms were bugged. He mandated the use of Signal for all sensitive communications. Signal is a messaging app that touts "privacy at its core" using encrypted messaging, disappearing messaging and the ability to share photos and videos that disappear within 24 hours.

58. Signal use became a method for Garner to escalate his grooming of Jane Doe 1. The encrypted application enabled him to communicate sexually explicit content, request nude photos, send "dick pics," and maintain a sexual relationship with Jane Doe 1 while evading detection by her family and community members.

**d. Garner Controls and Profits from Jane Doe 1's Housing (2021)**

59. Garner encouraged Jane Doe 1 to purchase a new construction build in the G.O.D. "neighborhood," built by his construction company, MCH Nashville. In 2021, Jane Doe 1 and a family member went under contract to purchase the home. Garner profited directly from this and further exerted control over Jane Doe 1's life, ensuring her proximity and dependence on him.

**e. Sexual Grooming and Escalation (Summer 2022-November 2022)**

60. In the summer of 2022, Garner began requesting outfit photos from Jane Doe 1 via Signal. This escalated rapidly from requests for regular outfits, to swimsuits, and eventually to nudes. Garner also sent Jane Doe 1 nude photos of himself.

61. One way Garner enticed Jane Doe 1 to send photographs was by asking for "fitness pictures." Garner would ask Jane Doe 1 about her fitness goals and then tell her that she should track her progress with photographs and that he could help by reviewing them. Garner then encouraged the progress pictures to be taken as full nudes.

62. Garner sent Jane Doe 1 money to buy a swimsuit for a vacation.

15

63. At multiple speaking events, Garner repeatedly asked Jane Doe 1 to "check his pants," claiming his penis was "so big, it was hard for him to hide." This happened on multiple occasions in public professional settings.

64. Garner initiated repeated conversations about his genitals, describing them as large and unusual.

65. The first time Garner sent Jane Doe 1 a "dick pic," he created a story that he had accidentally included his penis in the photo.

66. Garner encouraged Jane Doe's alcohol consumption at events, and then when she did so, Garner used this as an opportunity to extract private information from her, asking her to tell him intimate details about her life.

67. Garner began to closely monitor Jane Doe 1's dating life, constantly asking Jane Doe 1 for private details of her dating life and acting hurt if she did not share details with him.

68. Garner used other psychologically manipulative tactics to groom Jane Doe 1 and normalize a sexual relationship. Garner shared that he wished he had more opportunities with other women before marriage; claimed polygamy was normal in the Old Testament; and repeatedly emphasized that it was "better to lie with a friend than sleep with a random stranger."

69. In November 2022, after Jane Doe 1 came back from a bad date, Garner used this vulnerability to initiate the first kiss.

70. Garner positioned himself as Jane Doe 1's "instructor/mentor" as a method of escalating the sexual acts and continued to groom Jane Doe 1 through normalizing increasingly intrusive sexual contact and behavior.

**f. Sexual Assault and Coercion (November 2022-June 2025)**

71. Beginning in November 2022, Garner initiated sex acts with Jane Doe 1 in his office during work hours.

16

72.     Jane Doe 1 attempted to stop the escalation of Garner's sexual contact, but Garner would agree to stop momentarily only to re-initiate later. When Jane Doe 1 expressed concerns and moral objections, Garner would dismiss or argue with her, systematically dismantling her resistance over the course of months. This continual psychological manipulation wore down Jane Doe 1's defenses.

73.     On at least one occasion, Jane Doe 1 pushed Garner away with both hands and said, "Stop," only for Garner to re-initiate contact.

74.     Jane Doe 1 felt it was impossible to end the sexual relationship as Garner never listened to her requests to stop.

75.     In late 2022/early 2023, sexual intercourse began.

76.     After sexual intercourse began, Garner's verbal abuse of Jane Doe 1 in the workplace declined significantly. Jane Doe 1 felt a tremendous relief from the respite in Garner's abuse.

77.     Thereafter, the sexual relationship became a source of workplace confidence for Jane Doe 1—if Garner was unhappy with Jane Doe 1's work performance, at least she was meeting his needs in another area and therefore had the ability to avoid his verbal abuse and retaliation.

78.     Garner told Jane Doe 1 that if their sexual relationship was ever discovered, they would lie and deny it—which is exactly what Garner did when initially confronted in October 2025.

79.     Jane Doe 1 continued to express anxiety about the nature of their sexual relationship, but Garner used his religious authority to justify ongoing adultery and sexual exploitation, citing Bible passages to Jane Doe 1.

g.  **Employment Retaliation (September 2023)**

80.     As Garner's sexual abuse escalated in 2023, Jane Doe 1 tried to find a way to distance herself from him. She requested a transfer to a communications position that matched her skills and career goals.

81.     Instead of granting her the transfer, Garner held an impromptu "performance review" where he listed all the ways he felt Jane Doe 1 was "incompetent"—a retaliatory attack designed to punish her for setting boundaries. Garner then denied her request and told her the only opening available was as an assistant at one of his for-profit businesses.

82.     From September 2023-September 2024, Jane Doe 1 worked at that for-profit business in a role she did not want and a field she had never desired to work in. Physical intimacy with Garner continued but was reduced due to less available time together.

**h.  Discovery and Disclosure of Sexual Abuse (October 2025)**

83.     Jane Doe 1 lived in a state of shame, denial, and secrecy from the time her sexual abuse at the hands of Garner ended until October 2, 2025, when she first learned about other victims' experiences of sexual abuse at the hands of Garner. During this time, Jane Doe 1 was unable to identify what had happened to her as sexual assault and abuse due to the severe psychological manipulation and control Garner had exercised over her. Jane Doe 1 continued to participate in the G.O.D. community as though nothing had happened because any acceptance of the reality of her own sexual victimization would have shattered the world she had built for herself.

84.     It was only once Jane Doe 1 began understanding that Garner had perpetrated his abuse on multiple other victims, and hearing their similar stories, that she began to identify what had happened to her as nonconsensual and coerced. This began a process of retrieving memories that had been buried due to dissociation and blackout periods, which are typical trauma responses to sexual assault and abuse.

18

85.     By the end of October 2025, Jane Doe 1 began seeking support through psychological counseling. As she began to process Garner's sexual abuse and understand his psychological control over her, she realized how he had used his position of trust as lead pastor for the G.O.D. Entities to perpetrate his crimes.

### i.  Harassment After Discovery (October 2025)

86.     On October 5, 2025, after Garner received notice of suspension from leadership positions, he sent Jane Doe 1 21 messages (11 on Signal, 10 via iMessage) and called 10 times in 25 minutes before Jane Doe 1 turned off her phone.

87.     Garner began a smear campaign of the victims, including Jane Doe 1, claiming to community members that the women came on to him, were emotionally attached to him, and were emotionally distraught when he ended the affairs.

88.     None of this was true. Jane Doe 1 had no emotional connection to him but rather felt trapped and coerced into maintaining a relationship with him.

89.     Jane Doe 1 was terrified of further retaliation by Garner and left her house and neighborhood to stay elsewhere for several nights due to her fear of Garner's volatility. Due to the physical proximity of the neighborhood where many in the community lived, despite his suspension, Garner still lived in the neighborhood with the women he victimized.

## C.     Jane Doe 2's Factual Allegations

### a.  Early Grooming and Control (2007-2019)

90.     Jane Doe 2 first met Garner when she was 17 years old in 2007.

91.     Jane Doe 2 also began her initiation into Garner's G.O.D. community through a "mission's trip" led by him. Like Jane Doe 1, Jane Doe 2 was subjected to forms of psychological control and isolation during the trip, including sleep and food deprivation and social isolation.

Garner immediately began wearing down Jane Doe 2's physical barriers, requesting massages during the trip and creating sleeping arrangements that brought him physically close to her.

92.     Beginning on Jane Doe 2's first mission trip and continuing throughout the years of her grooming and abuse, Garner regularly requested Jane Doe 2 perform massages on him and, on occasion, his wife.

93.     From 2008 to 2015, Garner served as Jane Doe 2's teacher for classes, officiant at her wedding, and marriage counselor—positioning himself in roles of sacred trust over every major life transition during her formative adult years.

94.     In 2012, Jane Doe 2 began working for Garner. Since then, Jane Doe 2 has worked for three of Garner's for-profit businesses, all of which he owns at approximately 97% ownership levels while maintaining comprehensive control over her livelihood. Additionally, Garner tasked her with periodic assignments for other for-profit entities under his control.

95.     Jane Doe 2's work was intertwined with the G.O.D. religious community, making it impossible for her to separate employment relationships from spiritual community, and creating leverage which Garner used to prevent her from leaving or setting boundaries.

**b.  Comprehensive Life Control (2012-2025)**

96.     Over the years that Jane Doe 2 stayed in the G.O.D. community, Garner came to control every aspect of her life:

      a.  Employment: Beginning in 2012, Jane Doe 2 worked for three of Garner's businesses which he maintained majority ownership; she was unable to work outside his business empire due to fear of Garner's retaliation.

      b.  Housing: Garner became angry whenever Jane Doe 2 tried to find housing outside his control. In around 2024, Garner began pressuring Jane Doe 2 and her family to purchase housing that Garner's construction company,

MCH Nashville, owned. Garner had the power to manipulate housing access, pricing, and availability for the G.O.D. community because the properties in the surrounding neighborhood were MCH-owned and controlled land. When Jane Doe 2 declined to purchase property through Garner and started the process of purchasing a different lot, Garner was furious.

c. Children's Education: Garner controlled Jane Doe 2's children's education through his schools, using their schooling as implicit leverage over Jane Doe 2.

d. Financial Control: Garner and his family members made hundreds of thousands of dollars off G.O.D. affiliated for-profit businesses while members of G.O.D. were indoctrinated to provide free labor and services. Jane Doe 2's husband, for example, began working for Garner's construction company, MCH Nashville, in 2016, and continued to be employed by Garner through the time period of the sex trafficking Venture. Within this psychologically controlling environment, Jane Doe 2 had no ability to leave or demand fair compensation.

**c. Exploitation of Therapeutic Relationship (2019-2022)**

97.     In 2019, Jane Doe 2 began performing Electro-Lymphatic Therapy ("ELT") sessions for Garner.

98.     From 2019 through end of 2020 (approximately 18-24 months), Jane Doe 2 provided ELT therapy sessions with unclear or no compensation—extracting her professional services without fair payment.

21

99.    Each ELT session lasted between approximately one to two hours. Based on the regular frequency of these sessions, Jane Doe 2 performed an estimated 400-600 hours of unpaid or underpaid professional therapy services valued at approximately $47,500 at market rates.

100.    By the end of 2020, Garner had placed Jane Doe 2 in a position at Soma Wellness. Jane Doe 2 finally started to receive some pay for the ELT sessions with clientele, but only after providing nearly two years of free professional services. However, Jane Doe 2 continued to provide free services to Garner, who never paid for any of the massage therapy Jane Doe 2 provided him with.

101.    From 2020-2023, Jane Doe 2 worked at Soma Wellness as a Level 2 therapist (indicating higher skill level and experience).

102.    Compensation structure was paid on a per client served basis with a confusing discount percentage structure rather than guaranteed salary—making income uncertain and dependent on Garner's business decisions.

103.    Garner constantly pressured Jane Doe 2 to continue to work only for his businesses, claiming they were building something together, and using guilt and obligation to keep her working in his businesses for lower pay.

**d.  Grooming During Therapeutic Sessions (2020-2022)**

104.    During 2020-2022, Garner began crossing lines during the therapeutic relationship, transitioning from Jane Doe 2's ELT client to sexual predator.

105.    He would commonly schedule the sessions with Jane Doe 2 late at night, after 10 p.m., when no one was around.

106.    During the ELT sessions, Garner would lock the door to his in-home studio/office. The studio was a soundproofed room above his garage with double doors that acted as extra sound proofing.

22

107.    Beginning in around 2021 and continuing throughout the therapeutic sessions, Garner complained about his penis not being able to function properly due to scar tissue from a previous incident with a catheter. Garner used this as pretext to request Jane Doe 2 use the ELT wands directly on his penis.

108.    Garner manipulated the temperature in his office for the ELT sessions so that the room became unbearably hot. Garner then directed Jane Doe 2 to remove her clothes, under the guise of making her more comfortable in the heat. Over the course of months, Garner normalized Jane Doe 2 undressing and then used this environment to further erode Jane Doe 2's physical barriers by commenting on her body and instructing her to show him her breasts. The first time Jane Doe 2 exposed her breasts, she was so terrified that she audibly reassured herself, stating out loud as she lifted her shirt, "This is normal. This is normal." Throughout, Jane Doe 2 felt she could not refuse as Garner was her boss, spiritual leader, and controlled all aspects of her life, even though complying with Garner's commands contradicted all of her moral and religious beliefs.

### e.  Drugging and Sexual Assault (Fall 2022)

109.    In the Fall of 2022, Garner invited Jane Doe 2 to his office at 11 p.m. demonstrating the 24/7 access Garner demanded from Jane Doe 2.

110.    Garner kissed Jane Doe 2 and pushed his vape pen on her.

111.    Jane Doe 2 was unaware of the intensity of the substance. On information and belief, the vape pen contained a controlled substance that Garner administered without her informed consent.

112.    Garner then repeatedly pressured Jane Doe 2 to have sex with him, telling her that she would not remember anyway.

23

113.    This statement demonstrates Garner's knowledge that Jane Doe 2 was drugged and incapacitated, yet he proceeded to try to have sex with her anyway—constituting a drug-facilitated attempted rape.

114.    Jane Doe 2 has no memory of the first instance of sexual intercourse with Garner, which is a typical trauma response for a victim of rape.

### f.   Ongoing Sexual Exploitation (End of 2022-2025)

115.    From the end of 2022 through 2025, Garner continued to coerce Jane Doe 2 to engage in sex acts.

116.    Jane Doe 2 felt trapped in the relationship with no way to stop Garner. Every facet of Jane Doe 2's life remainder under the control of Garner from her employment to her housing and her children's schooling, to her church and faith community.

117.    Jane Doe 2 believed that retaining her job, her husband retaining his job, her children continuing in school, her continued professional development, and her ability to remain in the church community was all now conditioned on continuing to engage in sex acts with Garner.

118.    Immediately after the nonconsensual sexual intercourse began, Jane Doe 2's relationship with Garner shifted and became less stressful; Jane Doe 2's status improved, she experienced less of Garner's volatility, and moments of verbal abuse and tension lessened. Garner's approval and favor became tied to Jane Doe 2's participation in ongoing sex acts with him.

119.    Jane Doe 2 repeatedly disassociated during the sex acts, a typical trauma response to sexual assault.

120.    Garner refused to wear condoms stating that getting them in his size (large) was too expensive and he did not want to.

121.     As with his other victims, Garner told Jane Doe 2 that this was not an affair, using psychological manipulation and control to coerce Jane Doe 2 to participate in sex acts that contradicted her beliefs.

122.     Throughout the period of sexual abuse, between 2021-2025, Garner would request that all conversation with Jane Doe 2 occur on Signal, claiming this was necessary because of the sensitive information about his massage therapies with her. In fact, this was a method Garner used to escalate his grooming of Jane Doe 2, just as he did with Jane Doe 1. The encrypted application enabled him to communicate sexually explicit content, request nude photos, send "dick pics," and maintain a sexual relationship with Jane Doe 2 while evading detection by her family and community members.

123.     In May 2023, Jane Doe 2 quit Soma Wellness after three years of exploitation.

124.     In August 2023, Jane Doe 2 moved to a position with Hopewell Family Care (Garner 97% owner) where she started as a medical assistant, ultimately moving up to manager's assistant.

125.     From 2023-present, Jane Doe continues to work at Hopewell Family Care, which, on information and belief, remains under Garner's 97% ownership and control.

126.     Throughout this time, Garner's sexual abuse of Jane Doe 2 continued.

127.     Garner continued to victimize Jane Doe 2 as part of the sex trafficking Venture until at least the beginning of March 2025.

**g.  Discovery and Disclosure of Sexual Abuse (October 2025)**

128.     Like Jane Doe 1, Jane Doe 2 lived in a state of shame, denial, and secrecy from the time her sexual abuse at the hands of Garner ended until October 2, 2025, when she first learned about other victims' experiences of sexual abuse at the hands of Garner. During this time, Jane Doe 2 was unable to identify what had happened to her as sexual assault and abuse due to the

25

severe psychological manipulation and control Garner had exercised over her. Jane Doe 2 continued to participate in the G.O.D. community as though nothing had happened because any acceptance of the reality of her own sexual victimization would have shattered the world she had built for herself.

129.    It was only once Jane Doe 2 began understanding that Garner had perpetrated his abuse on multiple other victims, and hearing their similar stories, that she began to identify what had happened to her as nonconsensual and coerced. This began a process of retrieving memories that had been buried due to dissociation and blackout periods, which are typical trauma responses to sexual assault and abuse.

130.    In November 2025, Jane Doe 2 began seeking support through psychological counseling. As she began to process Garner's sexual abuse and understand his psychological control over her, she realized how he had used his position of trust as lead pastor for the G.O.D. Entities to perpetrate his crimes.

**h.  Harassment After Discovery (October 2025)**

131.    In September 2025, Garner called and Signal messaged Jane Doe 2 on two separate occasions in attempt to coerce her into lying about the years of sexual abuse she had suffered at Garner's hands. Garner attempted to obstruct justice, telling Jane Doe 2 to destroy or cover up evidence of their communications.

132.    After the sexual abuse became public, Garner began a smear campaign of the victims, including Jane Doe 2, claiming to community members that the women came on to him, were emotionally attached to him, and were emotionally distraught when he ended the affairs.

133.    Jane Doe 2 was terrified of further retaliation by Garner and left her house and neighborhood to stay elsewhere for several nights due to her fear of Garner's volatility. Due to the

physical proximity of the neighborhood where many in the community lived, despite his suspension, Garner still lived in the neighborhood with the women he victimized.

134.     Jane Doe 2 continues to live in fear of Garner and the potential for further retaliation in her work and her community after disclosing her sexual abuse at his hands.

**D.     Jane Doe 3's Factual Allegations**

**a.  Grooming the Minor Child (1999-2006)**

135.     In 1999, Jane Doe 3 was only fifteen years old, a freshman at a private high school where Defendant Garner was her Bible teacher and math instructor, when Garner began grooming her. Garner found opportunities to single her out, told her she was special, took her to ice cream after school, and invited her to his apartment for women's Bible study with his wife. Garner also invited her to study the Bible with him one-on-one without any other adults present before the start of the school day.

136.     Garner further expanded his control over Jane Doe 3 when she participated in one of his "mission's trips," traveling with Garner when she was only 16 years old to Mexico. During the trip, Garner began to erode her physical and personal barriers, at one point plucking her eyebrows to alter her appearance based on his preferences. This was the first time Garner exerted authority over her body.

137.     All facets of Jane Doe 3's began to revolve around Garner and G.O.D. Jane Doe 3 met her future husband attending Garner's in-home church services. Between 2003-2004, both she and her future husband became Institute for G.O.D. students under Garner's teaching.

138.     Between 2005 and 2006, Garner regularly asked Jane Doe 3 to perform massages on him in his office during off-hours when no one else was around, often late at night, even though Jane Doe 3 did not have any experience in massage therapy and had not yet finished her training. This slowly eroded Jane Doe 3's physical barriers and normalized physical touching between her

27

and Garner. Jane Doe 3 did not feel like she could say no to Garner who was her spiritual leader and pastor.

139.    In 2006, Garner performed music at Jane Doe 3's wedding and immediately began providing marriage counseling sessions to the couple, positioning himself as the authority over their marital relationship. Over the years, in the context of marriage counseling, Garner elicited details from Jane Doe 3 and her husband about their intimate life, information Garner would exploit.

**b.  Economic Exploitation (2006-2025)**

140.    Garner encouraged Jane Doe 3 to become a licensed massage therapist. In 2006, immediately after Jane Doe 3 became a licensed massage therapist, Garner began demanding free professional services.

141.    Garner had Jane Doe 3 bring her massage table to his office for evening sessions but rarely provided any payment at the end of the sessions. Jane Doe 3 felt unable to ask for Garner to pay given his position as her pastor and spiritual leader. Jane Doe 3 continued to provide in-home sessions for Garner and his wife for which Garner would only ever pay $20 total—when he did pay—never full price. Garner couched the underpayment as using Jane Doe 3's gifts for the benefit of God.

142.    Beginning in the summer of 2012, after Garner was in a vehicle accident, Jane Doe 3 became his on-call massage therapist for pain relief. No payment was ever discussed. Jane Doe 3 logged extensive unpaid treatment hours during his recovery.

143.    In 2013, Garner hired Jane Doe 3's husband as part-time teacher at the Academy; by 2017, her husband had been promoted to a director role. Garner also enrolled all four of Jane Doe 3's children in the Academy, a school completely under his ownership and control. Garner

now controlled: Jane Doe 3's job or potential jobs, her husband's job, and all four children's education.

144.   In 2014, Jane Doe 3 began working for Nova Birth Services, a business Garner created and controlled through his wife. Jane Doe 3 was their sole massage therapist.

145.   Garner preached about the importance of proximity to spiritual community, inducing Jane Doe 3 and her family to purchase a house on the same street as Garner's family, further entangling their lives.

146.   In 2018, Garner was diagnosed with thyroid cancer. Garner blamed the church for his cancer. Despite being in debt with four children, Jane Doe 3 and her husband, along with others in the church, donated over $70,000 to Garner for legal fees and cancer treatment.

147.   In 2018, Garner asked Jane Doe 3 to get trained in ELT (Electro-Lymphatic Therapy) in Georgia specifically to treat him. Jane Doe 3 paid over $2,000 for training, lodging, and meals while her family was in debt.

148.   Beginning in 2018, Jane Doe 3 began treating Garner twice per week with massage and lymphatic drainage for his cancer protocol—without any payment—continuing until his tumor and half his thyroid were removed in 2021.

149.   Sessions occurred in Garner's locked, soundproof studio—he locked both the downstairs door and upstairs studio door, ensuring they were alone and uninterrupted.

150.   Sessions lasted for hours. Jane Doe 3 logged over 8,000 hours alone with Garner in locked rooms from 2018-2021.

151.   During sessions, Jane Doe 3 held a blanket over her face while Garner climbed onto the massage table in his underwear. Over time, Garner stopped wearing underwear at all or would undress completely in front of Jane Doe 3. Garner watched increasingly scandalous sexual content

while Jane Doe 3 worked, furthering eroding Jane Doe 3's personal barriers and normalizing sexual content.

152. In 2019, Garner promised Jane Doe 3 and other families in the G.O.D. community housing in a special, new community development he was building. He then directed Jane Doe 3 and others to take out HELOC loans on their current properties and give him the money, purportedly for the new development. On information and belief, Garner used these funds to enrich himself. Jane Doe 3 and her family have never received these funds back.

153. In 2021, Garner was indicted for TennCare fraud after the investigation by TBI. The charges related to $18,000 in fraudulently obtained medical benefits. As a result of church associated solicitations, Jane Doe 3 and her husband felt compelled to donate money to Garner's legal fees and Jane Doe 3 continued to provide free massages to Garner to assist with stress relief.

154. In total, Jane Doe 3 provided at least 8,000 hours of specialized massages to Garner without any compensation. The market value of 8,000 hours of specialized massage and ELT services at Nashville rates (approximately $95/hour) is $760,000.

**c. Sexual Assault Escalation (2022-2025)**

155. On or about April 4, 2022, during a massage session in Garner's locked studio, Garner exposed his penis to Jane Doe 3, asked about his "fat pad," then exposed his entire genitals area, and asked her to use ELT wands on his penis.

156. Jane Doe 3 was terrified but tried to maintain a professional distance by covering his genitals. Jane Doe 3 did not tell anyone what had happened because Garner was her boss, mentor, business partner, lead pastor, marriage counselor, and financial advisor. Garner controlled all facets of Jane Doe 3's life by this point and Jane Doe 3 felt she had no power to stop Garner.

157.     On or about July 16, 2022, Garner texted Jane Doe 3 for two hours over Signal. He asked her to tell him "secrets" she had never shared with anyone, made her feel less ashamed, and asked if she took naked pictures and requested she share them.

158.     In late July 2022, Garner paid for Jane Doe 3's family vacation to Panama City Beach with Soma Wellness business money, falsely writing it off as a business expense. Garner would also be on this trip.

159.     Days before the trip, at a hangout at Garner's home, Garner kissed Jane Doe 3 on the lips twice in his kitchen while blocking her husband's view with the refrigerator door. Jane Doe 3 felt sick to her stomach and stopped eating for the week leading up to the trip, feeling severe anxiety about what Garner might attempt next.

160.     Garner texted Jane Doe 3 before the trip asking her how much she loved sex and how often she wanted to have sex on vacations.

161.     During the Panama City Beach trip, Jane Doe 3 went to get a broom from a dark hallway. Garner followed her and immediately started groping, kissing, grabbing her breasts, and putting his hands on her groin.

162.     When Jane Doe 3's husband interrupted, Garner threw Jane Doe 3 off him while darting into the hallway bathroom to hide.

163.     Jane Doe 3 then panicked and lied to protect Garner, the ministry, and her family's livelihood, telling her husband nothing had happened when in fact she had just been sexually assaulted by Garner.

164.     On the last day of the trip, Jane Doe 3 performed a massage for Garner in an upstairs bedroom at his request. Jane Doe 3 believed she would be safe because the door to the room did not lock. While she was massaging him, Garner asked if she wanted to do "stuff." Before receiving

any answer, Garner began touching Jane Doe 3. Jane Doe 3 froze while Garner proceeded to grope her genitals and kiss her.

165.    On or about August 22, 2022, Jane Doe 3 was in the middle of massaging Garner in his studio when he asked her to perform the massage in just her bra and underwear. The pretext for this request was how hot the room was; Garner had intentionally set the thermostat to a high temperature.

166.    Garner then asked to massage Jane Doe 3's breasts. Jane Doe 3 believed she had no other option but to say yes or else Garner would retaliate against her and her family.

167.    Jane Doe 3 went home crying, despondent that Garner's abuse would likely continue to escalate.

168.    In October 2022, during a massage session, Garner told Jane Doe 3 he was in a loveless and sexless marriage and asked her to manually copulate him. Garner claimed this would not count as sex or an affair.

169.    Garner further demanded Jane Doe 3's secrecy, manipulating her by telling her that if she said anything the whole ministry would be brought down.

170.    Jane Doe 3 perceived this as a threat to herself and to her husband who was still employed by Garner.

171.    Garner proceeded to have sexual intercourse with Jane Doe 3 without using condoms. Jane Doe 3 never verbally consented to having sexual intercourse and froze during the duration of the assault.

172.    After ejaculating, Garner immediately dressed and told Jane Doe 3 to clean up the studio while he showered. Jane Doe 3 felt disgusted, humiliated, and completely powerless to stop what had just happened from occurring again.

173.    From October 2022 through October 2025, Garner maintained a pattern of sexual exploitation of Jane Doe 3:

    a.   "Sexting" Jane Doe 3 throughout the workday via Signal.

    b.   Sending nude pictures of himself.

    c.   Asking Jane Doe 3 to stop by his office on the way home where he would proceed to wear down her physical barriers and then demand oral sex or intercourse before allowing her to leave.

    d.   Garner would also come to Jane Doe 3's office without prior warning and demand oral sex or intercourse before leaving.

    e.   Garner refused to accept Jane Doe 3's attempts to refuse sexual intercourse. Jane Doe 3 understood that if she did not stay silent and comply, Garner could destroy her livelihood, her family's housing and financial wellbeing, and her entire community.

    f.   When Jane Doe 3 arrived at his office, Garner took Jane Doe 3's phone, turned off location tracking, and told her to lie to her husband about her whereabouts.

174.    Once the sexual abuse began, Garner's treatment of Jane Doe 3 immediately improved: his verbal abuse lessened and he began offering her perks of employment, namely, access to the company credit card, which she had not had before. Jane Doe 3 understood that her sexual exploitation was directly tied to her employment and felt like any attempt to stop the abuse would result in retaliation and the loss of her position.

175.    Over the four-year period of her sexual exploitation, Jane Doe 3 became isolated from friends, her health deteriorated, she began abusing substances, she lost 15 pounds in two

months after disclosure, and she stopped being able to pray or listen to worship music—for a period of time, losing her spiritual faith entirely.

### d.  Business Fraud and Financial Exploitation (2022-2025)

176.  In 2022, Garner sold Jane Doe 3 a "1% ownership stake" in Soma Wellness for $1,000, promising her partnership in building the business.

177.  Despite being a 1% owner and the manager who built the clientele, Jane Doe 3 was paid only $14/hour for managerial duties and 25+ weekly client hours—far below market rate of $35-45/hour for a manager/lead therapist. As a result of this chronic underpayment, Jane Doe 3 and her husband struggled financially, which allowed Garner to exert further control over her.

178.  Garner paid Jane Doe 3 through "Owner's Draws" rather than with a proper salary, resulting in negative equity on her ownership stake despite her building the business.

179.  Garner took hidden and improperly recorded management fees without Jane Doe 3's knowledge or consent, enriching himself while she worked for below-minimum compensation.

180.  Garner used Soma Wellness business funds for personal expenses, including paying over $600 for his personal garage door repair with a business check. Garner was also constantly moving funds into and out of the Soma Wellness business accounts without providing any business justification or explanation.

181.  Garner promised Jane Doe 3 bonuses that rarely materialized, keeping her motivated with false hope of fair compensation.

### e.  Cover-Up and Evidence Destruction (September-October 2025)

182.  On or about September 10, 2025, Garner called Jane Doe 3 on Signal to tell her evidence had been turned into the church board. He revealed:

> a.  There was a recording of them having sex (not a TV show as he later claimed to others).

34

b. Text messages with three other women had been discovered.

c. He had a group text called "Threesome."

d. Garner had requested nude photographs from a family member of Jane Doe 3.

183. On or about October 3, 2025, during Jane Doe 3's last experience of sexual exploitation with Garner, Garner instructed her to lie on his behalf, telling her that he would "protect" her if she followed his script and denied that anything sexual happened between them.

184. Garner used this scripted lie when speaking to Jane Doe 3's husband on or about October 6, 2025.

185. On or about October 7, 2025, Garner engaged in systematic obstruction of justice:

a. Scripted Jane Doe 3's cover-up story in detail;

b. Made her practice lying to his wife and to a church board member three times over the phone.

c. Reminded her she was supposed to "take this to the grave" or the whole ministry would fall apart, and it would be her fault.

d. Ordered her to delete her entire Signal account.

186. In great distress, Jane Doe 3 complied, destroying evidence of three years of sexting and nude photos.

**f. Discovery and Disclosure of Sexual Abuse (October – November 2025)**

187. Jane Doe 3 lived in a state of shame, denial, and secrecy from the time her sexual abuse at the hands of Garner ended until October 7, 2025, when she discovered that Garner had sexually victimized other women in the community to a similar extent. During this time, Jane Doe 3 was unable to identify what had happened to her as sexual assault and abuse due to the severe psychological manipulation and control Garner had exercised over her. Jane Doe 3 accepted that

35

this was her "God-given" role—Garner manipulated her into believing that her silence and acceptance would preserve his role as spiritual leader of the community—because any acceptance of the reality of her own sexual victimization would have shattered the world she had built for herself and her family.

188.     It was only once Jane Doe 3 began understanding that Garner had perpetrated his abuse on multiple other victims, and hearing their similar stories, that she began to identify what had happened to her as nonconsensual and coerced. This began a process of retrieving memories that had been buried due to dissociation and blackout periods, which are typical trauma responses to sexual assault and abuse.

189.     In October 2025, Jane Doe 3 began intensive therapy to seek treatment for the years of psychological damage she had experienced because of Garner's sexual abuse and manipulation. As she began to process what had happened to her, she realized how Garner had used his position of trust as lead pastor for the G.O.D. Entities to perpetrate his crimes.

**E.     Plaintiffs Experienced and Continue to Experience Severe Harm and Damages**

190.     At all times material hereto, Plaintiffs have been and are continuously harmed by Garner and the G.O.D. entities

191.     Plaintiffs' ongoing injuries include, but are not limited to:

        a.  Bodily injury,

        b.  Extreme psychological harm,

        c.  Deprivation of property and income,

        d.  Deprivation of a right to privacy, and

        e.  Emotional distress.

<u>**COUNT I**</u>
<u>**Sex Trafficking, 18 U.S.C. §§ 1591, 1594, and 1595**</u>
<u>**(on behalf of all Plaintiffs against all Defendants)**</u>

36

192. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count I are made against all Defendants.

193. Plaintiffs bring claims under 18 U.S.C. §§ 1591(a)(1), (2), 1594, and 1595 based on the Defendants participation in the sex trafficking Venture in which Defendant Garner recruited, enticed, harbored, provided, obtained, maintained, and solicited by any means Plaintiffs, where coercion and force was used to cause them to engage in commercial sex acts.

194. Plaintiffs further bring claims under 18 U.S.C. § 1595 based on each of the Defendants' respective financial benefit garnered from knowingly assisting, supporting, and facilitating the sexual exploitation of Plaintiffs for commercial sex acts.

195. Garner used his position as the CEO, lead pastor and spiritual leader of the G.O.D. entities to perpetrate the Venture.

196. Each of the Defendants knew or should have known that it received value for its respective ongoing business practices that allowed Garner to perpetrate the sex trafficking Venture.

197. Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1), (2) and 1595(a) occurring within the territorial jurisdiction of the United States.

198. The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

199. Each of the Defendants knowingly benefited from participation in what it knew or should have known was a sex trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2) and/or 1595(a).

200. Each Defendant knowingly benefited from, and/or received value for participation in the venture in which Defendant knew that Plaintiffs would be forced to engage in commercial sexual acts by use of force or coercion.

201. Defendants' conduct caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

202. The conduct of each Defendants, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

203. Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### COUNT II
### Forced Labor, 18 U.S.C. §§ 1589, 1594 and 1595
### (on behalf of all Plaintiffs against all Defendants)

204. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count II are made against all Defendants.

205. Defendant Garner knowingly obtained the labor and services of Jane Does 1-3, by any combination of the following means: (1) by means of serious harm and threats of serious harm to that person and another person; and (2) by means of any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm, and attempted to do so, in violation of 18 U.S.C. §§ 1589(a)(2), (4) & (b), 1594, and 1595.

38

206.    Defendant G.O.D. Entities knowingly benefited, financially or by receiving anything of value, from participation in the above forced labor Venture which engaged in the providing or obtaining of labor or services by any of the means described in subsection § 1589(a), knowing or in reckless disregard of the fact that the venture engaged in the providing or obtaining of labor or services by any of such means.

207.    Each of the Defendants knew or should have known that it received value for its respective ongoing business practices that allowed Garner to perpetrate the forced labor Venture.

208.    The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

209.    Defendants' conduct caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

210.    The conduct of each Defendants, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

211.    Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**Count IV**
**THRA Sexual Harassment**
**(on behalf of all Plaintiffs against all Defendants)**

212.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count IV are made against all Defendants.

39

213. Plaintiffs were subjected to severe sexual harassment consisting of sexual assault in Defendants G.O.D. Entities' workplaces because of their sex, female.

214. Defendant Garner, the CEO and lead pastor of the G.O.D. Entities, was Plaintiffs' spiritual leader and supervising employer, in that he had the authority to control Plaintiffs' job duties within the G.O.D. Entities and affiliated for-profit businesses and to direct their daily work activities.

215. Defendants G.O.D. Entities are vicariously liable for the sexually hostile work environment, sexual harassment, and sexual assault perpetrated by Garner and are liable for contributing to and failing to remedy sexual harassment in the workplace.

216. The harassment was ongoing and continuous until October 2025.

217. Defendants G.O.D. Entities knew or should have known of the conduct of its lead pastor and CEO, Garner.

218. As a direct and proximate result of Defendants' unlawful acts, Plaintiffs suffered and continue to suffer physical and emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience, and loss of earnings and benefits.

**Count V**
**THRA Retaliation**
**(on behalf of all Plaintiffs against all Defendants)**

219. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count V are made against all Defendants.

220. It is public policy and the laws of the State of Tennessee that employees must be able to exercise their rights under state and federal law without fear of reprisal or penalty from an employer.

221.    Plaintiffs were employed by one or more of the Defendants G.O.D. Entities.

222.    Contrary to the public policy and the laws of the State of Tennessee, as well as in violation of the Tennessee Humans Right Act, Plaintiffs were retaliated against for objecting to and complaining about sexual harassment in the workplace by Defendant Garner, the CEO and lead pastor of the G.O.D. Entities.

223.    Plaintiffs were then subjected to threats to their jobs, coercion to be silent and/or compliant with Defendant Garner's plans to lie about the harassment, and the sullying of their reputations.

224.    As a direct and proximate result of Defendants' unlawful acts, Plaintiffs suffered and continue to suffer physical and emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience, and loss of earnings and benefits.

<u>**COUNT VI**</u>
<u>**Assault and Battery**</u>
<u>**(on behalf of all Plaintiffs against all Defendants)**</u>

225.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count VI are made against all Defendants.

226.    Defendant Garner intentionally assaulted and committed battery against Plaintiffs.

227.    Defendant Garner's alleged conduct was within the scope of employment and within the work-related limits of time and place.

228.    Defendants G.O.D. Entities are vicariously liable for the acts of its agents, particularly since Garner acted as the CEO, founder, and lead pastor of the G.O.D. Entities, served as Plaintiffs' spiritual leader and supervisor, and controlled all facets of Plaintiffs' lives through his role as G.O.D. leader.

41

229. As a result, Plaintiffs have been damaged and are entitled to recover damages, including, but not limited to, lost wages, physical and emotional distress, consequential damages, punitive damages, costs, interest and any other legal and equitable relief to which they may be entitled.

**COUNT VII**
**Intentional Infliction of Emotional Distress**
**(on behalf of all Plaintiffs against all Defendants)**

230. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count VII are made against all Defendants.

231. All Defendants engaged in extreme and outrageous conduct toward Plaintiffs. The sexual harassment and assault of Plaintiffs was intentional or reckless, outrageous, not conduct tolerated in our society, and intended to and did cause serious physical and mental injury.

232. All Defendants intended to cause emotional distress or recklessly disregarded whether its conduct would cause emotional distress.

233. All Defendants' intentional conduct caused Plaintiffs severe emotional and physical injury resulting in damages.

**COUNT VIII**
**Negligent Infliction of Emotional Distress**
**(on behalf of all Plaintiffs against all Defendants)**

234. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count VIII are made against all Defendants.

235. All Defendants engaged in extreme and outrageous conduct toward Plaintiffs. The sexual harassment and assault of Plaintiffs was negligent, reckless, outrageous, not conduct tolerated in our society, and without regard for and did cause serious physical and mental injury.

236. Defendants G.O.D. Entities negligently caused emotional distress or recklessly disregarded whether its conduct would cause emotional distress.

237. All Defendants' conduct caused Plaintiff severe emotional distress and physical injury resulting in damages.

**COUNT IX**
**Negligent Hiring/Retention/Supervision**
**(on behalf of all Plaintiffs against Defendants G.O.D. Entities)**

238. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count IX are made against Defendants G.O.D. Entities.

239. Defendants G.O.D. Entities owed a duty of care to Plaintiffs.

240. Defendants G.O.D. Entities breached that duty in the hiring, training, and retention of Garner, permitting him to stay in the role of CEO and lead pastor, as he was unfit for the job and posed an unreasonable risk of harm to Plaintiffs.

241. Defendants G.O.D. Entities did not take appropriate steps to oversee Garner either before or after the harassment and sexual abuse of Plaintiffs.

242. Defendants G.O.D. Entities knew or should have known that Garner's conduct would cause harm to Plaintiffs.

243. Plaintiffs suffered damages as a result of Defendants' conduct.

**Count X**
**Negligence**
**(on behalf of all Plaintiffs against all Defendants)**

244. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

245. Defendant Garner owed Plaintiffs multiple, independent duties of care arising from his various relationships with them, including as a fiduciary, an employer, pastor and spiritual counselor, marriage counselor, business partner, and teacher and mentor.

246. Defendant Garner breached each of these duties of care through conduct including, but not limited to grooming Plaintiffs for eventual sexual abuse; exploiting his position of authority and power to gain sexual access to Plaintiffs; maintaining comprehensive control over Plaintiffs' employment, income, housing, children's education, and spiritual community, creating economic coercion; using alcohol and drugs to facilitate sexual contact with Plaintiffs; isolating Plaintiffs from support systems and requiring secrecy about his conduct; retaliating against Plaintiffs who attempted to set boundaries; and destroying evidence and scripting false testimony when his conduct was discovered, prolonging Plaintiffs' trauma and preventing them from obtaining help.

247. Defendant Garner's conduct fell below the standard of care that a reasonable person would have exercised under similar circumstances.

248. Defendant Garner knew or should have known that his conduct created a foreseeable risk of severe physical, psychological, and economic harm to Plaintiffs.

249. At all relevant times, Defendants G.O.D. entities owed Plaintiffs a duty of reasonable care arising from their roles as religious organizations, educational institutions, and employers.

250. Defendants G.O.D. Entities breached their duties of care by: failing to implement adequate policies, procedures, and safeguards to prevent sexual abuse and exploitation by Defendant Garner; failing to maintain adequate supervision and oversight of Defendant Garner despite his comprehensive control over members' employment, housing, finances, children's education, and spiritual lives; failing to investigate or respond to complaints, reports, or warning

44

signs of Defendant Garner's inappropriate conduct with female members and employees; permitting Defendant Garner to maintain sole control and authority over all organizational operations without meaningful accountability or oversight; allowing Defendant Garner to simultaneously serve as spiritual leader, employer, marriage counselor, and business partner to the same individuals, creating inappropriate dual relationships and conflicts of interest; failing to maintain appropriate boundaries between religious ministry, employment relationships, and business operations; permitting an organizational structure that enabled comprehensive psychological and financial control over members and employees; allowing Defendant Garner to control housing, employment, and children's education in ways that prevented victims from leaving or reporting abuse; disregarding corporate formalities and allowing funds to be moved between entities without proper oversight or accountability; failing to implement financial controls to prevent wage theft, unpaid labor, and economic exploitation; and creating and maintaining a high-control organizational structure that isolated members from outside support and enabled systematic abuse.

251.     Defendants G.O.D. Entities knew or should have known that their failures to implement adequate safeguards and oversight created an unreasonable risk of harm to Plaintiffs and other members.

252.     Defendants G.O.D. Entities' breaches of their duties of care were a proximate cause of Plaintiffs' injuries, including but not limited to sexual assault, economic exploitation, emotional distress, and loss of wages and services.

253.     As a direct and proximate result of Defendants G.O.D. entities' negligence, Plaintiffs suffered and continue to suffer severe physical, psychological, emotional, and economic harm.

254.    Defendants G.O.D. Entities' conduct was reckless and demonstrated conscious disregard for the rights and safety of Plaintiffs, warranting an award of punitive damages.

255.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and continue to suffer substantial damages for which they are entitled to full compensation.

## RELIEF REQUESTED

Plaintiffs respectfully request:

1.    A jury trial;

2.    Compensatory and punitive damages for emotional distress, mental anguish, and disruption to each Plaintiffs' family life, physical injury, pain and suffering, medical expenses, and all compensatory damages and or economic damages caused by the actions of Defendants.

3.    Any equitable or injunctive relief the Court deems appropriate to address the conduct alleged in this Complaint and prevent further harm to Plaintiffs.

4.    Attorneys' fees and expenses;

5.    Prejudgment interest and, if applicable, post-judgment interest; and

6.    Any such general relief to which Plaintiffs may be entitled.

Respectfully submitted,

HMC Civil Rights Law, PLLC

*/s/ Heather Moore Collins*
Heather Moore Collins (# 026099)
Ashley Shoemaker (#037651)
302 Peachtree St. Nashville, TN 37210
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*—and --*

Advocates for Survivors of Abuse PC

46

/s/ Vanessa Baehr-Jones
Vanessa Baehr-Jones CABN # 281715
(*Pro Hac Vice* Forthcoming)
**Baehr-Jones Law PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

*Attorneys for the Plaintiffs*