**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

**Jane Doe 1, et al.,**

**Plaintiffs,**

**v.** **No: 3:26-cv-00231-WDC-CF**

**Gregg Garner, et al.,**

**Defendants.**
**___________________________________/**

## OPPOSITION TO DEFENDANT GREGG GARNER'S MOTION TO DISMISS

Defendant Gregg Garner's motion to dismiss Plaintiffs' claims amounts to nothing more than an attempt to dispute the alleged facts of the case. Garner in effect asks the Court to treat this as a summary judgment motion and has injected his own false narrative to minimize and obscure the extent of his abuse. At the pleading stage, however, the Court must treat Plaintiffs' allegations as true and reject Garner's misstatements. Citing almost no authority, Garner also makes generalized, unsupported assertions that Plaintiffs have not adequately pleaded the elements of their claims. But Plaintiffs have pleaded facts sufficient to state plausible claims against Garner under the Trafficking Victims Protection Act ("TVPA") for sex trafficking and forced labor, as well as their state law claims. The Court should deny Garner's motion.

## RELEVANT FACTUAL ALLEGATIONS

Jane Doe 1, Jane Doe 2, Jane Doe 3 lived nearly their entire adult lives under the powerful influence of the cult-like leader Defendant Gregg Garner. Garner began tutoring Jane Doe 3 in one-on-one Bible sessions when she was only 15 years old. ECF 1 ¶ 135. Jane Doe 2 met Garner on a mission trip he led when she was only 17 years old and then enrolled in his unaccredited Bible college, the Institute for G.O.D. International. *Id.* ¶¶ 91-92. Jane Doe 1 similarly fell under his

sway on a mission trip and then enrolled in the Institute. *Id.* ¶¶ 40-42. Over the next decade, Garner indoctrinated Plaintiffs into his closed, religious community, using his role as founder, CEO, and lead pastor of Defendants Global Outreach Developments International (G.O.D), Institute for G.O.D. International, and the Church Community for G.O.D. (collectively, "the G.O.D. Entities") to manipulate and control every facet of their lives. *Id.* ¶¶ 31-34.

## I. Garner Indoctrinated Plaintiffs During "Mission Trips"

Garner recruited minors and young adults into G.O.D. through "mission trips." Plaintiffs each went on Garner-led mission trips abroad during which he used traditional cult-like methods to indoctrinate them. *Id.* ¶ 31. Plaintiffs were often deprived of food, sleep, information, any sense of time/schedule, and contact with the outside world. During these trips, Garner would alternate between verbal abuse, berating the recruits in front of each other, and lavishing them with attention and praise. *Id.* These wild swings of behavior left Jane Does 1-3 in a state of constant apprehension as to whether they would receive approval from Garner or incur his abuse for some unanticipated failure. *Id.* The recruits were conditioned to always seek Garner's favor. *Id.* This became a powerful form of psychological control. *Id.*

After their missions' trips, and at Garner's direction, Plaintiffs each enrolled in the Institute for G.O.D., the Bible-based college which Garner also founded and ran. *Id.* ¶ 32. Garner's psychological control over the recruits became total in this setting: he controlled and monitored students' contacts with the outside world, including forbidding dating outside the Institute, and managed every aspect of their daily lives. *Id.* Jane Doe 1 became estranged from her family who questioned Garner's methods and worried that he was using cult-like methods to control and isolate his recruits. *Id.* ¶ 42. Jane Does 2-3 married other G.O.D. members under Garner's direction and counseling. *Id.* ¶¶ 93, 139.

## II. Defendant Garner Controlled Plaintiffs' Employment and Housing

Garner continued to control all aspects of Plaintiffs' lives after their graduation from the Institute. Garner assigned Jane Does 1-3 to jobs within the G.O.D. Entities, including for-profit entities owned in whole or majority part by Garner, stating that it was part of God's plan for them to perform this work, even if they had no prior experience or training to perform such labor.

Garner instructed Jane Doe 1, for instance, to take a position as his assistant. *Id.* ¶ 44. For the next six years, Jane Doe 1 worked directly under Garner's supervision, and was expected to be at his beck and call 24-7. *Id.* Throughout this time, Garner verbally and emotionally abused her, humiliating her and isolating her by spreading negative information about her work to others in the organization. *Id.* ¶ 47-48. When Jane Doe 1 tried to switch positions, Garner refused and insisted she remain his assistant. *Id.* ¶ 49. By the time Garner began sexually abusing Jane Doe 1 in 2022, his daily verbal abuse over the past six years had left her mentally unstable. *Id.* ¶ 48.

Garner also controlled Jane Doe 1's housing. In 2021, he instructed her to purchase a new construction build in the G.O.D. "neighborhood," built by his construction company, MCH Nashville. *Id.* ¶ 59. Garner profited directly from the sale and further exerted his total control over Jane Doe 1's life by ensuring her proximity and dependence on him. *Id.*

Jane Doe 2 also went straight from Garner's Institute into employment he controlled. Beginning in 2012, Jane Doe 2 worked for three of Garner's businesses which he maintained majority ownership; she was unable to work outside his business empire due to fear of Garner's retaliation. *Id.* ¶ 96. Garner also became angry whenever Jane Doe 2 tried to find housing outside his control. *Id.* In around 2024, Garner began pressuring Jane Doe 2 and her family to purchase housing that Garner's construction company. *Id.* When Jane Doe 2 declined to purchase property through Garner and started the process of purchasing a different lot, Garner was furious. *Id.* Not

only did Jane Doe 2's employment depend on Garner, but her husband also worked for Garner and her children attended Garner's school, the Academy for G.O.D. *Id.*

Jane Doe 3 similarly worked for a G.O.D. affiliated for-profit companies beginning in 2014. *Id.* ¶ 144. At Garner's direction, she became a licensed massage therapist. *Id.* ¶ 140. Garner then demanded she provide him and his wife with free services for years as part of the alleged forced labor scheme. *Id.* ¶¶ 141-42, 148. Garner also instructed Jane Doe 3 to live within the G.O.D. neighborhood, inducing her to live on the same street as him. *Id.* ¶ 145. In 2019, Garner further enriched himself by demanding additional funds from Jane Doe 3 and other families in the G.O.D. community, purportedly to build housing in a special, new community development. *Id.* ¶ 152. Instead, Garner used these funds to enrich himself and never returned Jane Doe 3's money.

## III. Plaintiffs Lived, Worked, and Worshipped in a Closed, Religious Community

Because G.O.D. members' housing was all in the same "neighborhood." Garner decided who lived where and the houses once acquired by someone in the G.O.D. community were typically sold to other community members. *Id* ¶ 37. This neighborhood was located within walking distance to the Academy where all the members' children attended. Members were encouraged to work for G.O.D. Entities or for-profit affiliates. *Id.* Garner discouraged and monitored contact with the outside world and insisted on complete ostracization of any former members who had crossed him. *Id.* ¶ 35. Because Plaintiffs' entire lives revolved entirely around the G.O.D. community, with their employment, housing, finances, and extended family tied to Garner-run entities, the possibility of ostracization terrified them and served as a powerful form of control. *Id.* Within this context, Plaintiffs reasonably feared that Garner would cause them serious harm if they refused his demands. *Id.* ¶¶ 30-37.

//

## IV. Garner Sexually Assaulted and Abused Plaintiffs for Years

Between 2022 and 2025, Garner coerced and forced Plaintiffs to engage in sex acts with him. *Id.* ¶¶ 60-79, 109-27, 155-75. None of the Plaintiffs had any romantic interest in Garner. Jane Does 2 and 3 were happily married and Jane Doe 1 worked as his direct subordinate. Each felt terrified when Garner began groping them against their will. *Id.* Plaintiffs reasonably believed that any attempt to stop Garner's sexual abuse would result in serious harm to them and their families.

Once Plaintiffs began submitting to Garner's sexual advances, their position and status with Garner and within the G.O.D. Entities improved. *Id.* ¶ 38-39, 76-77, 117-18, 174. Garner's verbal and emotional abuse lessened. *Id.* Plaintiffs also received other benefits, including access to a company credit card and improved employment conditions. *Id.*

## V. Garner Retaliated Against Plaintiffs After They Disclosed Their Abuse

Plaintiffs' fear of harm by Garner was justified: As soon as Plaintiffs began disclosing what had happened to them at Garner's hands, Garner retaliated. Garner began a smear campaign of Plaintiffs, claiming to community members that the women came on to him, were emotionally attached to him, and were emotionally distraught when he ended the affairs. *Id.* ¶ 132. Jane Doe 2 was terrified of further retaliation by Garner and left her house and neighborhood to stay elsewhere for several nights due to her fear of Garner's volatility. *Id.* ¶ 133. Garner also tried to keep Jane Doe 3 silent, threatening her that the whole ministry would fall apart if she did not "take this to the grave" and instructing her to lie to her husband and others in the community. *Id.* ¶ 185. Garner also ordered her to delete her entire Signal account. *Id.*

## LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc., v. Treesh*, 487 F.3d

471, 476 (6th Cir. 2007). Against that backdrop, the court considers whether the complaint "contain[s] sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## ARGUMENT

### I. Defendant Garner Misstates and Ignores the Alleged Facts

In the absence of favorable case law, Garner not only misstates the factual allegations in his Motion, but he has invented an entirely different, self-serving, version of the facts. Garner's factual assertions appear nowhere in the Complaint and do not represent Plaintiffs' allegations.

A. <u>Garner Attempts to Minimize Plaintiffs' Sexual Assaults as "Affairs"</u>

Garner repeatedly describes the sexual assaults and abuse of the Plaintiffs as "affairs," and mischaracterizes their delayed disclosures as "later recharacterized sexual encounters," attempting to minimize his coercive sexual abuse. *See, e.g.*, ECF 31 at 6, 15, 16, 20 ("Section 1589 does not convert an alleged affair or sexual relationship with a client into federal forced labor because the client also underpaid for services."). But there is nothing in the Complaint that suggests the victims of Garner's abuse "recharacterized" their abuse when they came forward in October 2025. Indeed, the real-time descriptions of Garner's sexual assaults and abuse of Plaintiffs are harrowing:

- Garner instructed Jane Doe 1 to take "naps" with him during work and then groped her from behind while she remained silent and disassociated from her body. ECF 1 ¶53-54.
- "Jane Doe 1 pushed Garner away with both hands and said, 'Stop,' only for Garner to re-initiate contact." *Id.* ¶ 73.
- "The first time Jane Doe 2 exposed her breasts, she was so terrified that she audibly reassured herself, stating out loud as she lifted her shirt, 'This is normal. This is normal.'" *Id.* ¶ 108.
- "Jane Doe 2 has no memory of the first instance of sexual intercourse with Garner, which is a typical trauma response for a victim of rape." *Id.* ¶ 114.
- "Jane Doe 2 repeatedly disassociated during the sex acts, a typical trauma response to sexual assault." *Id.* ¶ 119.
- Jane Doe 3 was "terrified" the first time Garner exposed his penis to her. *Id.* ¶ 156.

- Jane Doe 3 felt "sick to her stomach" the first time Garner kissed her without her consent. *Id.* ¶ 159.
- Garner groped Jane Doe 3 from behind without her consent, throwing her away from him when he thought her husband would see. *Id.* ¶ 161-62.
- Jane Doe 3 "froze" when Garner groped her genitals the first time without her consent. *Id.* ¶ 164.
- "Garner proceeded to have sexual intercourse with Jane Doe 3 without using condoms. Jane Doe 3 never verbally consented to having sexual intercourse and froze during the duration of the assault." *Id.* ¶ 171.
- After the assault, Jane Doe 3 felt "disgusted, humiliated, and completely powerless to stop what had just happened from occurring again." *Id.* ¶ 172.

These were not consensual "affairs" that were only later "recharacterized" as abuse, a factual narrative invented by Garner in his Motion, but incredibly traumatic experiences that left permanent harm. *See, e.g.*, *id.* ¶ 175 ("Over the four-year period of her sexual exploitation, Jane Doe 3 became isolated from friends, her health deteriorated, and she began abusing substances[.]").

As described in the Complaint, delayed disclosure of sexual abuse is a typical trauma response. *See, e.g.*, *id.* ¶¶ 83-85, 128-30, 187-89. Delayed disclosure occurs in cases of sexual abuse and assault *not* because a victim has "recharacterized" the traumatic event, but because the guilt, shame, and self-blame a victim endures makes disclosure of their abuse extremely difficult. Survivors worry, rightly, about being believed. Their internalized feelings of shame perpetuate the false notion that they are at fault. And perpetrators like Garner take advantage of these feelings by instilling fear in their victims, creating false narratives that the victims are also to blame, pressuring the victims to remain silent, and insisting that disclosure will harm them too. That is exactly what Plaintiffs allege happened here. *See, e.g.*, *id.* ¶ 169 (Garner told Jane Doe 3 "the whole ministry would be brought down" if she said anything about the sexual assaults.).

Minimization is also a typical trauma response by survivors. This is a psychological protection mechanism that allows a survivor to continue to function despite the trauma of sexual abuse and assault. Especially here, where the Plaintiffs' entire world revolved around the spiritual

community built and controlled by their abuser, disclosure would, and did, result in significant repercussions for them and their families. *Id.* ¶¶ 86-89, 131-34, 182-86.

Tellingly, the only instances where the Complaint uses the word "affair" is to describe Garner's *own* statements and mischaracterization of his abuse to the Plaintiffs. *Id.* ¶¶ 87, 121, 132, 168. Garner attempted to justify and minimize his sexual abuse of Plaintiffs by claiming it was "Biblical," referencing stories of "adultery," in the Bible. *Id.* ¶¶ 68, 79. But Garner's version of the facts does not stand in the place of Plaintiffs' allegations. These words were manipulative and false then, just as they are now. In ruling on a motion to dismiss, the Court must accept Plaintiffs' allegations as true and reject the false narrative Garner invents in his Motion.

B. Garner Mischaracterizes Forced Labor as "Volunteerism"

Garner goes on to minimize and recharacterize the facts of Plaintiffs' forced labor claim as well. He uses euphemism like "housing and employment entanglement," "volunteerism," "employment friction," and "demanding employer," in place of the facts Plaintiffs have pleaded. ECF 31 at 13, 15. But Plaintiffs have described an entirely different environment than what Garner's euphemisms suggest:

- Garner placed Jane Doe 1 in employment positions she did not want based on his interpretation of the will of God and then berated and verbally abused her. ECF 1 ¶¶ 44-48.
- Garner profited directly from Jane Doe 1's purchase of a property within the G.O.D. neighborhood from his G.O.D.-affiliated, for-profit company and used this to further exert control over Jane Doe 1's life. *Id.* ¶ 59.
- Jane Doe 2 "was unable to work outside [Garner's] business empire due to fear of Garner's retaliation." *Id.* ¶ 96.
- "Garner became angry whenever Jane Doe 2 tried to find housing outside his control." *Id.* ¶ 96.
- "Garner controlled Jane Doe 2's children's education through his schools, using their schooling as implicit leverage over Jane Doe 2." *Id.* ¶ 96.
- Jane Doe 2 provided ELT therapy sessions to Garner for 18-24 months without proper compensation. *Id.* ¶ 98.
- Garner constantly pressured Jane Doe 2 to work only for his company for below-market pay. *Id.* ¶ 103.

- By 2013, Garner controlled: "Jane Doe 3's job or potential jobs, her husband's job, and all four children's education." *Id.* ¶ 143.
- "Garner preached about the importance of proximity to spiritual community, inducing Jane Doe 3 and her family to purchase a house on the same street as Garner's family[.]" *Id.* ¶ 145.
- Beginning in 2018, Jane Doe 3 began treating Garner twice per week with massage—without any payment—in his locked, soundproof studio.[1] During these sessions, he would expose himself and eventually began groping Jane Doe 3. *Id.* ¶¶ 148-50, 155-56.
- Garner promised Jane Doe 3 and other families in the G.O.D. community housing in a special, new community development he was building. He then directed Jane Doe 3 and others to take out HELOC loans on their current properties and give him the money. *Id.* ¶ 152.

None of these facts supports Garner's version of events. Again, in ruling on his Motion, the Court must accept Plaintiffs' allegations as true and reject Garner's self-serving euphemisms.

## II. Precedent Supports Plaintiffs' Sex Trafficking and Forced Labor Claims

Garner misstates and mischaracterizes the facts to avoid addressing the well-established case law supporting Plaintiffs' sex trafficking and forced labor claims. Plaintiffs have pleaded facts sufficient to establish that the long-term psychological, financial, and reputational control Garner exerted over them created an intensely coercive environment where they felt compelled to engage in commercial sex acts and unpaid services and labor. At the pleading stage, these allegations are more than sufficient to defeat Garner's motion.

### A. Plaintiffs Reasonably Feared "Serious Harm" After Years of Garner's Psychological, Financial, and Reputational Control

Plaintiffs allege that the totality of the circumstances of their relationships with Garner over a period of more than a decade created an intensely coercive environment in which they lost their agency. Garner's abusive manipulation began when they were young—Jane Does 2 and 3 were

[1] The Complaint contains a typo (an extra 0): Jane Doe 3 expended over 800 hours of unpaid labor between 2018-2021 treating Garner, *not* 8,000, resulting in $76,000 in unpaid services. *See id.* ¶¶ 150, 154.

still minors.[2] A reasonable person who had been so psychologically controlled and emotionally abused for so long—whose entire adult existence revolved around Garner and the G.O.D. Entities—would have felt similarly compelled.

Plaintiffs rely on a theory of coercion for both the sex trafficking and force labor claims based on Garner's ability to threaten "serious harm."[3] ECF 1 ¶¶ 30-37. Chapter 77 of Title 18 includes the same definition of "serious harm" for both the forced labor and the sex trafficking provisions at issue here:

> The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing [labor or services in order to avoid incurring that harm] / [commercial sexual activity in order to avoid incurring that harm].

*Compare* 18 U.S.C. 1589(c)(2) *with* 18 USC § 1591(e)(5).

Section 1591(e)(2)(B) defines the second enumerated means of coercion for sex trafficking as "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm." 18 U.S.C. § 1591(e)(2)(B). Similarly, § 1589(a) proscribes obtaining labor or services of anyone "by means of any scheme, plan, or pattern intended to cause the person

---

[2] Garner argues that Plaintiffs' sex trafficking claim falls outside the statute of limitations because Plaintiffs include factual allegations dating back to 2007, but this is a red herring. ECF 31 at 3-4. All the sex acts alleged in the Complaint fall well within the 10-year statute of limitations. ECF 1 ¶¶ 71, 109-14, 173 (alleging sex acts as to Jane Does 1, 2, and 3 beginning in 2022). Plaintiffs allege facts regarding their recruitment and indoctrination into Garner's G.O.D. Entities because this background is critical in describing the totality of the circumstances behind Garner's coercion. The fact that the victims of Garner grew into adulthood completely under his authority and control explains why it was impossible for them to refuse to participate in coerced sex acts and forced labor. This has nothing to do with the statute of limitations and everything to do with understanding the psychological control Garner wielded.

[3] Garner argues that Plaintiffs have not alleged that they were minors at the time of the commercial sex acts, nor that the use of legal process compelled them to engage in commercial sex acts. ECF 31 at 4-6. These are more red herrings. Neither of these theories is alleged in the Complaint and Garner's arguments on these points are entirely irrelevant. Plaintiffs allege that Garner used force and coercion under § 1591(a)(2). ECF 1 ¶ 193.

to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]" 18 U.S.C. § 1589(e)(4).

This definition of coercion "requires jurors to look not at each threatening act in isolation, but instead at the entire course of the defendant's threatening conduct." *United States v. Delaney*, No. 18-1919, 2022 WL 356731, at *3 (7th Cir. Feb. 7, 2022), *reh'g denied*, No. 18-1919, 2022 WL 1652309 (7th Cir. May 24, 2022). Whether a defendant exerted coercion over his victims under the federal sex trafficking and force labor statutes is a fact-specific inquiry for the jury to decide. "While the standard is objective—referring to whether a 'reasonable' person would feel compelled to engage in commercial sex acts—it also requires that the court take into consideration 'all the surrounding circumstances,' including any factors that might make the victim particularly vulnerable." *Ramsbottom v. Ashton*, No. 3:21-CV-00272, 2024 WL 4993391, at *13 (M.D. Tenn. Dec. 5, 2024) (quoting *United States. v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015). In *Rivera*, the court described this as a "hybrid" consideration that allows the jury to consider the subjective position of the victim, including the totality of the circumstances contributing to the coercion, as well as to evaluate the objective reasonableness of the victim's acquiescence under these circumstances. *Rivera*, 799 F.3d at 186–87.

Here, Plaintiffs were uniquely vulnerable to Garner's control because of the years of grooming, verbal abuse, indoctrination, and psychological control he had exerted over their lives. *See United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("[A] victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude."). In the case of Jane Doe 3, she began taking individual Bible study lessons with Garner when she was only 15 years old. ECF 1 ¶ 135. Jane Doe 2 met Garner when she was just 17 years old and participated in

a mission trip abroad. *Id.* ¶ 91. During the trip, Garner controlled every aspect of her life, including her access to food, sleep, and any outside communications. *Id.* When she returned, Garner continued to control her communications, living situation, and social world, and he exerted authority over her as her spiritual leader and teacher. *Id.* ¶ 93. Garner was involved in both Jane Doe 2 and Jane Doe 3's marriages, counseling them and introducing them to their husbands through G.O.D. *Id.* ¶¶ 93, 137, 139. By the time Garner's sexual abuse of the Plaintiffs began, they had lived all their adult lives under his control, and he controlled all aspects of their lives, including their work, housing, marriages and dating life, and children's schooling. *See, e.g.*, *id.* ¶ 96. Jane Doe 1 was even estranged from her own family as a young adult because her family members feared Garner had indoctrinated her into a cult. *Id.* ¶ 42. Given the totality of these circumstances, a reasonable person would have felt similarly compelled.[4]

Garner relies on *Ramsbottom* but that case is both factually and procedurally distinct. The court in *Ramsbottom* was evaluating the plaintiffs' sex trafficking claims at the summary judgment stage and was therefore engaging in a fact-finding role, reviewing the evidence adduced during discovery. *Ramsbottom v. Ashton*, No. 3:21-CV-00272, 2024 WL 4993391, at *1 (M.D. Tenn. Dec. 5, 2024). *See also* Fed. R. Civ. P. 56 (courts assess sufficiency of the evidence at summary judgment). Here, the Court must assess only whether Plaintiffs pleaded sufficient factual content to make their claim facially plausible, a much lower standard easily met by the Complaint's allegations. *See Iqbal*, 556 U.S. at 678.

---

[4] The extent of Plaintiffs' allegations distinguishes this case from *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012), where the only threat of "serious harm" was ostracization from the religious community. Here, Plaintiffs have also alleged numerous "serious harms" in addition to ostracization from their religious community, including the threat of loss of employment for them and their spouses, loss of housing, loss of their children's schooling, and their psychological abuse and manipulation by Garner. *Headley*, an appeal from a grant of summary judgment, is neither factually nor procedurally on point.

*Ramsbottom* is also factually inapposite. There, plaintiffs engaged in sexual relationships with an older, famous DJ and music producer, Bassnectar Ashton. *Ramsbottom*, 2024 WL 4993391, at *5-10. The alleged grooming amounted to Ashton telling the plaintiffs they were "special" and "more mature" than "guys [their] age," and acting like a "mentor" or "father figure." *Id.* at *5, 8, 9. The alleged "isolation" the plaintiffs experienced was merely Ashton's general "disapproval of [plaintiff's] friends" and his desire that the plaintiff be a "homebody." *Id.* at *5. The plaintiffs had brief encounters with Ashton but otherwise were free to live their own lives. *Id.* at *5-10. While there were obvious power imbalances in the relationship, there was nothing about Ashton's position in the plaintiffs' lives that would otherwise create an inherently coercive dynamic. The court described the "psychological force" there as "nothing other than a desire to please a famous man [plaintiff] clearly admired and whose approval she sought." *Id.* at *15. *Ramsbottom*'s facts are easily distinguishable from this case where Plaintiffs allege they were indoctrinated over years into a religious community that controlled all facets of their lives.

This case factually resembles other sex trafficking and forced labor cases involving cults. In *Raniere*, for instance, the criminal indictment against the former leader of the notorious NXIVM cult describes a coercive scenario nearly identical to what Plaintiffs experienced here:

- Raniere demanded "absolute commitment," including by "exalting" his teachings and ideology and not tolerating dissent.
- Raniere induced "shame and guilt" to influence members and associates of the religious cult.
- Raniere obtained "sensitive information about members and associates" of the cult to control them.
- Raniere recruited and groomed sexual partners for himself.
- Raniere isolated "associates and others from friends and family and making them dependent on [NXIVM] for their financial well-being[.]"
- Raniere used "harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics[.]"
- Raniere encouraged "associates and others to take expensive NXIVM courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits[.]"

*United States v. Raniere*, 384 F. Supp. 3d 282, 294 (E.D.N.Y. 2019) (quoting and citing indictment). Garner's model of control—enrolling his victims in the Institute, grooming them for years, shaming and verbally abusing them, isolating them from friends and family, threatening ostracization, and then positioning them in employment and housing entirely dependent on him—follows the exact same cult-leader playbook.

In *Majeed*, another criminal case involving a cult leader, the district court held that evidence demonstrating the cult leader created a "climate of fear" was admissible at trial to prove the "serious harm" elements of forced labor and sex trafficking. This evidence included, among other things, threats of "excommunication" and "eternal damnation"; verbal abuse such as publicly humiliating members who broke rules, made mistakes at work, or were deemed overweight; food restrictions; and various forms of isolation. *United States v. Majeed*, No. 21-20060-JAR, 2024 WL 992884, at *9-12 (D. Kan. Mar. 6, 2024). At the pleading stage, Plaintiffs' allegations of similar types of "serious harm" more than suffice to plead the coercion element.

Even far less extensive means of control have been found coercive by juries. In *United States v. Johnson*, for example, the defendant claimed he could offer modeling work to his victims as part of a scheme to induce his victims into having coerced sex with him. No. 19 CR 405-1, 2024 WL 4278071, at *1 (N.D. Ill. Sept. 24, 2024). The court upheld the jury verdicts despite less evidence supporting the coercion element than is alleged here. In the case of one victim, it was factually sufficient that the defendant "criticized her performance and body image and scrutinized her past sexual history." *Id.* at *6. In the case of another victim, the defendant "offered her not only modeling work but an opportunity for cheap rental housing in downtown Chicago," which he then threatened to withhold if she did not meet with him for a follow-up filming session. *Id.* The court explained that "[i]t was the jury's prerogative to accept that all four women 'reasonably' feared

serious harm—whether psychological, financial, or reputational—from Mr. Johnson's manipulative campaign." *Id.*

Here, Plaintiffs need only have alleged a facially plausible claim of coercion as to Counts I and II. The Complaint's allegations here describing the "serious harm" Plaintiffs faced if they did not comply more than suffice.[5] *See* ECF 1 ¶¶ 30-37.

B. <u>Plaintiffs Received Things "of Value" on Account of their Sex Acts with Garner</u>

Citing no authority, Garner contends that Plaintiffs' allegations do not set forth the "in-kind sex-for-money exchange required under [the] statute." ECF 31 at 8. But Garner ignores well-established case law defining the relevant provisions of the federal sex trafficking statute.

Section 1591(e)(3) defines a "commercial sex act" for purposes of the sex trafficking statute as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Court have consistently interpreted the phrase "anything of value" broadly to include intangibles and non-monetary exchanges. *See, e.g., United States v. Cook*, 782 F.3d 983, 988-89 (8th Cir. 2015) (holding that "[t]he phrase 'anything of value' is extremely broad" and encompasses "sexual acts, photographs, and videos"); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018) ("Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'—requires a liberal reading."); *United States v. Rivera*, No. 6:12-CR-121, 2012 WL 6589526, at *5 (M.D. Fla. Dec. 18, 2012) (holding "anything of value" "encompasses more than just monetary gain," including "ordination as a prophet"), *aff'd*, 551 F. App'x 531 (11th Cir. 2014).

[5] Citing no authority, Garner also asks the Cout to dismiss Count II as time-barred based on a four-year statute of limitations. ECF 31 at 17. In fact, § 1595 provides the relevant statute of limitations for both Count I and II, which is ten years. *See* 18 U.S.C. § 1595(c)(1). Plaintiffs' alleged violations under § 1589 and § 1591 both fall within that period. Garner's argument is meritless.

Things of value can include a wide range of intangibles: "amusement," "[s]exual intercourse, or the promise of sexual intercourse," "a promise to reinstate an employee," "an agreement not to run in a primary election," "[t]he testimony of a witness," and "the opportunity for a sexual encounter, in return for distributing child pornography." *United States v. Raniere*, 55 F.4th 354, 361 (2d Cir. 2022) (collecting examples from cases). "[A]nything of value" also encompasses promises to help a person with career advancement. *See*, *e.g.*, *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, at *9 (S.D.N.Y. Sept. 9, 2021); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019). Like the alleged benefits here, "things of value" can also include continued employment, relief from the threats of negative feedback, and career advancement that would not have happened otherwise. *Treminio v. Crowley Mar. Corp*., 649 F. Supp. 3d 1223, 1231 (M.D. Fla. 2023). "Anything of value" is a subjective concept, meaning it matters whether the thing is valuable to the person receiving it. *Cook*, 782 F.3d at 988 (quoting *United States v. Petrovic*, 701 F.3d 849, 858 (8th Cir. 2012)).

Here, Plaintiffs have alleged things of value that are both financial and intangible: improved status with Garner, access to a company credit card, improved employment conditions, additional income, continued employment, and avoidance of retaliation. ECF 1 ¶¶ 38-39. These "things of value" were subjectively beneficial to Plaintiffs. Jane Doe 1, for instance, had suffered verbal abuse for years under Garner and an improved situation that minimized this abuse benefited her significantly. Indeed, improved status with a cult leader was precisely the "thing of value" relied on by the government in the prosecution of the NXIVM leader. *See Raniere*, 384 F. Supp. 3d at 319. These allegations are more than sufficient to support Count I.

Garner next disputes that the "things of value" were "on account of" the sex act. ECF 31 at 8. But Plaintiffs have alleged facts sufficient to support a "causal connection" between the sex

acts and the "things of value." *See United States v. Raniere*, 55 F.4th 354, 365 (2d Cir. 2022) ("Section 1591(e)(3) require[s] a causal connection between the sexual act and the giving or receiving of anything of value."). Plaintiffs alleged that the benefits "were offered in the context of the coerced sex act, often in the same room before or immediately after the sex act, or in the context of a victim threatening to take some kind of action to reveal the assaults." ECF 1 ¶ 38. *See also id.* ¶¶ 76-78, 117-18, 174. At the pleading stage, these allegations set forth a facially plausible causal connection between the things of value and the sex acts.

The causal connection here between Plaintiffs' improved positions with Garner and the sex acts is similar to that in the NXIVM case. There, the Second Circuit upheld Raniere's conviction for sex trafficking, finding that there was a sufficient causal connection where the sex act of one victim resulted in the cult leader, Raniere, being "happy" with the victim's recruiter. *Raniere*, 55 F.4th at 365–66. The recruiter's improved position within the cult was sufficient to be the "thing of value," and there was a sufficient connection between that benefit and the sex act. *Id.*

Not only does Garner's argument ignore the relevant caselaw indeed, Garner cites no cases that support his arguments on these points-it is also premature. It will be for the jury to determine as a factual matter whether the "things of value" have sufficient causal connections to the sex act. *See Raniere*, 384 F. Supp. 3d at 319 ("Whether or not Mack or Raniere received benefits such as 'status' or 'acts of care' before the alleged sex acts occurred, simply as a result of their membership in an organization or whether they received these benefits on account of the alleged sex acts, is a factual question not appropriate for resolution on a pre-trial motion to dismiss.") (internal citations omitted). Here, Plaintiffs have alleged facts plausibly connecting the sex acts with things of value.

//

//

## III. The Complaint Supports the Plausibility Standard for the State Law Claims

A bare assertion that dismissal of the assault and battery claims is warranted, without recitation of the elements or identification of alleged deficiencies is insufficient to justify dismissal under Rule 12(b)(6). *McNeary v. Bartlett City Bd. of Educ*., 2025 U.S. Dist. LEXIS 30412, *10 (W.D. Tenn. Feb. 20, 2025) (denied motion to dismiss assault and battery claims where defendant failed to cite legal standard or articulate specific argument why plaintiff failed to state a claim). For this reason alone, Garner's motion to dismiss the assault and battery claims is due to be denied.

### A. Assault

Notwithstanding the deficiencies of the motion, "In Tennessee, the tort of assault has two elements: '(1) [a]n intentional attempt or the unmistakable appearance of an intentional attempt to do harm to, or to frighten, another person; and (2) [t]he present ability or the unmistakable appearance of the present ability to do that harm or to cause that fright.'" *Doe v. Andrews*, 275 F. Supp. 3d 880, 887 (M.D. Tenn. 2017) (citation and quotations omitted).

The allegations here satisfy both elements as to each Plaintiff. With respect to intent to frighten, Garner engaged in a persistent pattern of threatening conduct designed to intimidate Plaintiffs into silence. Garner commanded Plaintiffs to "take it to the grave" and threatened that disclosure would destroy the ministry and be the victims' fault (ECF 1 ¶ 29). He directed these threats at women over whom he held complete authority. Garner maintained comprehensive psychological and financial control over Plaintiffs' lives by simultaneously occupying multiple positions of authority over each victim, and in many instances, their spouses' employment: pastor, employer, marriage counselor, business partner, financial advisor, and children's educator (ECF 1 ¶ 34). As to Jane Doe 3 specifically, Garner demanded her secrecy, manipulating her by telling her that if she said anything the whole ministry would be brought down, which Jane Doe 3 perceived

as a threat to herself and to her husband who was still employed by Garner. (ECF 1 ¶¶ 169–170). Days before the Panama City Beach trip, Garner kissed Jane Doe 3 on the lips twice in his kitchen while blocking her husband's view with the refrigerator door, causing Jane Doe 3 to feel severe anxiety about what Garner might attempt next. ECF 1 ¶ 159.

Garner also plainly had the present ability to carry out these threats. He was physical proximate to his victims and demonstrated a willingness to act on his intimidation. On October 5, 2025, after receiving notice of his suspension from leadership positions, Garner sent Jane Doe 1 twenty-one messages and called ten times within twenty-five minutes before she turned off her phone. *Id.* ¶ 86. Similarly, in September 2025, Garner called and Signal messaged Jane Doe 2 on two separate occasions in an attempt to coerce her into lying about the years of sexual abuse she had suffered at his hands, and attempted to obstruct justice by telling her to destroy or cover up evidence of their communications. *Id.* ¶ 131. Following his suspension, Garner still lived in the neighborhood with the women he victimized, causing both Jane Doe 1 and Jane Doe 2 to leave their homes and stay elsewhere out of fear of his volatility. *Id.* ¶ 89. Jane Doe 3 understood that if she did not stay silent and comply, Garner could destroy her livelihood, her family's housing and financial wellbeing, and her entire community. ECF 1 ¶ 173(e).

B. Battery

Battery is "an intentional act that causes an unpermitted, harmful or offensive bodily contact." *Lacy v. Hallmark Volkswagen Inc. of Rivergate*, 2017 Tenn. App. LEXIS 462, 2017 WL 2929502, at *4 (Tenn. Ct. App. July 10, 2017) (citation and quotations omitted). However, "not every physical contact that is uncontested to is so offensive that it amounts to a battery." *Reagan*, 692 F. Supp. 2d at 904 (quoting *Runions v. Tenn. State Univ.*, 2009 Tenn. App. LEXIS 420, 2009 WL 1939816, at *4 (Tenn. Ct. App. 2009)). Rather, contact is "offensive" for the purposes of

battery if it "infringes on a reasonable sense of personal dignity ordinarily respected in a civilized society." *Lacy*, 2017 Tenn. App. LEXIS 462, 2017 WL 2929502, at *4 (quotations omitted).

The complaint alleges numerous acts of non-consensual physical contact by Garner against each Plaintiff. As to Jane Doe 1, during office "nap" sessions, Jane Doe 1 would lie silently on the couch while Garner lay next to her and groped her. ECF 1 ¶ 53. This conduct was non-consensual: Jane Doe 1 later pushed Garner away with both hands and said, "Stop," only for Garner to re-initiate contact. *Id.* ¶ 73. The abuse escalated further: beginning in November 2022, Garner initiated sex acts with Jane Doe 1 in his office during work hours, and in late 2022, sexual intercourse began. *Id.* ¶¶ 71, 75.

As to Jane Doe 2, Garner systematically dismantled her physical boundaries before initiating contact. Garner directed Jane Doe 2 to remove her clothes under the guise of making her more comfortable in the heat, and over the course of months normalized her undressing, then used this environment to further erode her physical barriers by commenting on her body and instructing her to show him her breasts. *Id.* ¶ 108. Garner then administered a controlled substance without her consent: he kissed Jane Doe 2 and pushed his vape pen on her; Jane Doe 2 was unaware of the intensity of the substance, and on information and belief, the vape pen contained a controlled substance that Garner administered without her informed consent. *Id.* ¶¶ 110–11. Jane Doe 2 has no memory of the first instance of sexual intercourse with Garner, which is a typical trauma response for a victim of rape. *Id.* ¶ 114.

As to Jane Doe 3, the complaint alleges multiple separate incidents of offensive physical contact. On or about April 4, 2022, during a massage session in Garner's locked studio, Garner exposed his penis to Jane Doe 3 and asked her to use ELT wands on his penis. *Id.* ¶ 155. During a trip, Garner followed Jane Doe 3 into a dark hallway and immediately started groping, kissing,

grabbing her breasts, and putting his hands on her groin; when her husband interrupted, Garner threw Jane Doe 3 off him and darted into the hallway bathroom to hide. *Id.* ¶¶ 161–62. On the last day of that trip, before receiving any answer, Garner began touching Jane Doe 3, who froze while Garner proceeded to grope her genitals and kiss her. *Id.* ¶ 164. During subsequent studio sessions, Garner asked to massage Jane Doe 3's breasts, and Jane Doe 3 believed she had no other option but to say yes or else Garner would retaliate against her and her family. *Id.* ¶ 166. Finally, Garner proceeded to have sexual intercourse with Jane Doe 3 without condoms; Jane Doe 3 never verbally consented and froze during the duration of the assault. *Id.* ¶ 171.

These allegations demonstrate deliberate physical contact that each plaintiff made clear was unwanted, carried out by a person in a position of total authority over them satisfies the standard that the contact infringed on a reasonable sense of personal dignity ordinarily respected in a civilized society. Thus, the assault and battery claims meet the plausibility standard.

C. Plaintiff Pled Facts Sufficient to Implicate Application of the Discovery Rule

As part of his word soup gripe about Plaintiffs' assault and battery allegations, Garner contends that "there is a substantial limitations problem" and again, without citation to a single case, he goes on to assert that plaintiff will rely on "delayed discovery." ECF 31 at 22.

"A defense predicated on the statute of limitations triggers the consideration of three components—the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Doe v. Piraino*, 2025 U.S. Dist. LEXIS 233063, *10 (M.D. Tenn. Nov. 26, 2025).

Accrual "relates to the date on which the applicable statute of limitations begins to run." *Redwing*, 363 S.W.3d at 457. Tennessee applies the "discovery rule" to determine accrual. *Id.* at 458. Tennessee's discovery rule has been refined to "make clear that it include[s]

not only the discovery of the injury but also the discovery of the source of the injury." *Id.* (citations omitted). Thus, "[u]nder the current discovery rule, a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Id.* at 459. The latter is typically referred to as "'constructive notice' or 'inquiry notice.' . . . [I]nquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed . . . . [O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Id*.

Generally, "the question of whether a plaintiff exercised reasonable care and diligence in discovering an injury or wrong is a question of fact for the jury." *Piraino*, 2025 U.S. Dist. LEXIS 233063, *12 (*citing Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995)). In *Doe v. Piraino,* Judge Trauger determined at both the motion to dismiss and summary judgment stage, that under Tennessee's discovery rule, the parents were not on inquiry notice of an intentional tort claim arising from Jane Doe's shoulder injury until July 2021, when they learned of Piraino's sexual misconduct, because earlier knowledge of an "overuse" shoulder injury did not place a reasonable person on notice that the injury was intentionally inflicted due to wrongful conduct. The court explicitly applied *Redwing*'s refinement of the discovery rule, emphasizing that accrual requires notice not only of an injury, but of the source of the injury as wrongful conduct. Knowledge that Jane Doe suffered a medically diagnosed overuse injury did not, standing alone, notify the parents that the source was intentional punishment tied to sexual abuse, as opposed to negligent coaching. Similarly, when the Sixth Circuit was confronted with this issue where multiple women were abused over a twenty-year period that did not become public until nearly twenty years after the

last act, it was determined that accrual requires notice of institutional causation, not merely notice of abuse. *Snyder-Hill v. Ohio State Univ*., 48 F.4th 616, 702-703 (6th Cir. 2022).

Likewise, courts have applied the discovery rule in cases like this where there were allegations of undue influence through mind-control and psychological conditioning that prevented plaintiffs from recognizing the wrongfulness of the conduct or their legal rights. *Lujan v. Mansmann*, 956 F. Supp. 1218, 1225-1225 (E.D. Penn. 1997) (denial of motion to dismiss based on allegations that plaintiff experienced "cult-like" therapy harmful to her well-being); *Wollersheim v. Church of Scientology*, 212 Cal. App. 872, 902 (2d Dist. Ct. App. July 18, 1989) (reversed in part, on other grounds) (affirmed that plaintiff's causes of action for negligent and intentional infliction of emotional distress were subject to discovery rule due to coercion by the church and church leaders).

Defendant Garner is wrong, the allegations in this case are not merely premised on an after the fact re-characterization. The facts of the Complaint are straightforward, the victims here had been in a high control situation for decades, groomed and led to believe they were doing "G.O.D.'s" work through Garner. Consistent with *Redwing, Piraino* and *Snyder-Hill*, only a jury can determine application of the discovery rule in this instance. *See* ECF 1 ¶¶ 2, 23, 29, 33, 34, 38, 39, 79, 141, 187.

D. Count IV and V THRA claims against Garner

Well taken scrivener's error, there are no THRA claims against an individual like Garner.

//

E. Garner Fails to Demonstrate Dismissal of Counts VII (Intentional Infliction of Emotional Distress), VIII (Negligent Infliction of Emotional Distress), and X (Negligence) is Warranted[6]

Plaintiffs' Complaint alleges approximately 190 factual allegations, in addition to each count of injury, yet Garner complains Counts VII, VIII, IX (which is not alleged against him) and X, are nonetheless "boilerplate" and that intentional and negligent claims cannot co-exist, all while failing to cite a single case to support his request to dismiss these claims. ECF 31 at 23. Again, Garner is mistaken.

To state a claim for intentional infliction of emotional distress, a plaintiff must establish: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). These elements are supported in the Complaint. ECF 1 ¶¶ 27-28, 29, 48, 53, 63-64, 78, 81, 83, 86-87, 89, 108, 112, 171-172, 173 (c-d), 175, 185, 191, 202, 217.

To state a claim for negligent infliction of emotional distress, a plaintiff must establish the elements of a general negligence claim: (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation. *See Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996). *See* ECF 1 ¶¶ 27-28, 48, 53, 83, 108, 112, 171-172, 173 (c-d), 175, 217, 240, 241, 250. In addition, the plaintiff must establish the existence of a serious or severe emotional injury that is supported by expert medical or scientific evidence. *Id*. *See* ECF 1 ¶¶ 85, 130, 189.

A plaintiff must establish five elements to prevail on a claim of negligence: (1) a duty of care owed by the defendant to the plaintiff; (2) breach of that duty of care by the defendant; (3) injury or loss; (4) causation in fact; and (5) proximate, or legal, cause. *King v. Anderson Cty.*, 419

[6] Garner also argues that Count IX - Negligent, Hiring, Retention, Supervision should be dismissed, but acknowledges that claim was not pled against him. Thus, he has no standing to raise that claim.

S.W.3d 232, 246 (Tenn. 2013). Here, Garner owed independent duties of care as fiduciary, employer, pastor, spiritual counselor, marriage counselor, business partner, and teacher/mentor. (ECF 1 ¶¶17, 245). Garner breached his duties of care by grooming plaintiffs, exploiting his position of authority, engaging in economic coercion, dictating isolation and secrecy, retaliating, and destroying evidence and scripting false testimony. ECF 1 ¶¶ 24-28, 29, 31, 34, 36-37, 38-39, 44, 45, 50, 52, 60-68, 66, 79, 81, 86-87, 93, 104-108, 109-13, 131, 135-36, 139, 156, 169-70, 176-79, 183-87. Garner caused harm. *Id.* ¶¶ 83, 128, 175, 187, 191. This claim is adequately pled.

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court (1) dismiss Count IV and V, the THRA claims, as to Defendant Garner only; and (2) deny Defendant Garner's motion to dismiss as to all other Counts.

Respectfully submitted,

*/s/ Heather Moore Collins*
Heather Moore Collins BPR # 026099
**HMC Civil Rights Law PLLC**
302 Peachtree Street
Nashville, TN 37210
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com

-- *and* --

*/s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715
(*Pro Hac Vice* Forthcoming)
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via the Court's CM/ECF filing system on April 13, 2026, to all counsel of record:

| | |
|---|---|
| Bryant Kroll (#33394)<br>The Law Office of Bryant Kroll<br>P.O. Box 219,<br>Pegram, TN 37143<br>Bryant@BryantKroll.com<br>Office: (615) 994-1837<br><br>*- and -*<br><br>James W. Cobb (#033248)<br>Cobb Law Group<br>131 Walton Ferry Road<br>Suite 11<br>Hendersonville, TN 37075<br>James@CobbLawTn.com<br>Office: (615) 649-0049<br><br>*Attorneys for Defendant Gregg Garner* | **Taylor, Pigue, Marchetti & Blair, PLLC**<br><br>L. Gino Marchetti, Jr., #005562<br>Charles Michels, #031232<br>2908 Poston Avenue<br>Nashville, Tennessee 37203<br>(615) 320-3225<br>gmarchetti@tpmblaw.com<br>cmichels@tpmblaw.com<br><br>**STARNES DAVIS FLORIE LLP**<br><br>Alan S. Bean, #026194<br>K. Nicole Poole, #038552<br>3000 Meridian Blvd., Suite 350<br>Franklin, TN 37067-6673<br>Phone: (615) 905-7200<br>Fax: (615) 807-4802<br>abean@starneslaw.com<br>npoole@starneslaw.com<br><br>*Attorneys for Defendants Global Outreach Developments International, Institute for G.O.D. International, and the Church Community for G.O.D* |

*/s/ Heather Moore Collins*
Heather Moore Collins